MARIA KEARNER, Admx. vs. CHARLES S. TANNER COMPANY.

JULY 7, 1910.

PRESENT: Dubois, C. J., Blodgett, Johnson, and Sweetland, JJ.

(1)  *Negligence.  Explosion.  Res ipsa loquitur.*

Two explosions occurred in a building used as a starch factory, throwing the walls into the street, causing death of intestate, a traveller on the highway. Plaintiff contended that the death of intestate was caused by negligence of defendant as the result of fire coming in contact with starch dust, which was present in large quantities on defendant's premises and highly explosive under certain conditions. Defendant, while admitting this explosion, contended that the initial, and more violent, explosion occurred in an adjoining shop, whence it was transmitted to defendant's premises, causing the explosion.

*Held,* that the case came within the doctrine of *res ipsa loquitur,* requiring the defendant to bear the burden of the explanation thereby imposed.

*Held,* further, that the location of the origin of the explosion was a question of fact, but until there was proof to the contrary the presumption was it originated where it occurred; and the burden of explaining that it had its inception elsewhere was upon defendant.

(2)  *Evidence.  Form of Question.*

Where the form of a question does not disclose the objection urged, the court is not required to analyze the testimony to determine such fact.

(3)  *Evidence.  Hypothetical Questions.*

Rules for hypothetical question stated.

(4)  *Evidence.  Hypothetical Question.*

Because a witness states that he founds his opinion upon certain facts, it is not to be assumed that the jury will find such facts to be true, if not proved by competent evidence.

TRESPASS ON THE CASE for negligence. Heard on exceptions of defendant, and overruled.

DUBOIS, C. J. This is an action of trespass on the case for negligence, brought by the widow of Albert C. Kearner in her capacity as administratrix of his estate, to recover, for the benefit of herself and minor children, damages from the defendant corporation, arising from the death of her intestate husband, which she alleged was caused by the negligence of the

defendant company on the twelfth day of February in the year 1908.   The case was tried in the Superior Court before a jury, and resulted in a verdict for the plaintiff, which the justice presiding at the trial refused to disturb upon a motion for a new trial, and the case was brought to this court upon the defendant's exceptions to various rulings of said justice, including his denial of the motion for a new trial.

It appears in evidence that on the day aforesaid, between 4:10 and 4:30 o'clock in the afternoon, two or more explosions occurred in a building on the easterly side of South Main street, between Coin and Silver streets, in the city of Providence, Rhode Island, which threw the stone walls of the building down into South Water street, as well as into Coin street, on the corner of which streets the body of said Albert C. Kearner was found the next day under the debris.   It was admitted at the trial that the death of the plaintiff's intestate was caused by portions of the wall of the building falling upon him, and that he was rightfully upon the highway as a traveller and in the exercise of due care at the time.   The building, which was wrecked by the explosion and partially consumed by the ensuing fire, was a structure three and a half stories in height; was about eighty feet in length by about forty-eight feet in width, and was bounded as follows:   On the North by Silver street; on the east by an area or alleyway, running from Silver street to Coin street; on the south by Coin street; and on the west by South Water street.   With the exception of two rooms on the ground floor, the entire building was occupied by the defendant company and used in the manufacture of starch, gums, and dextrine.   These two rooms were occupied by Abbott L. G. Chase, a grocer and ship chandler; one was on the corner of Coin and South Water streets and fronted on the latter.   It was about eighteen feet in width by about forty feet in length, and was used by Mr. Chase for his grocery store.   The other, a room of equal size, separated from the grocery department by a brick wall, adjoined it on the north and also had its entrance on South Water street; this room was used by Mr. Chase for his ship-chandlery shop.   The rear wall at the easterly extremity of

these rooms was about two feet distant from the westerly end of the furnace and oven-room of the defendant, and the northerly wall of the chandlery shop was about half way between Coin and Silver streets. There was no communication between the two rooms aforesaid or between the premises of Mr. Chase and those of the defendant, while there was free communication between the several parts of the building occupied by the defendant. The remainder of the ground floor of the building was used by the defendant, which had its offices in the room at the corner of Silver and South Water streets, and the next room, south of its offices and between them and the ship-chandlery shop of Mr. Chase, was a room occupied by the defendant for storage purposes. In the rear of its offices was another storage room, and beyond that to the east was its engine room. To the east of the building occupied by Mr. Chase and the defendant as aforesaid, was another two-story building adjoining the northerly half of the first mentioned-building, the ground floor of which was used by the defendant in part for storage and furnace and boiler rooms. There were four furnaces in all, which, for the purposes of the trial, were described, as though numbered from north to south, 1, 2, 3, and 4. This building measured about thirty feet in width and extended from Silver to Coin streets. The portion that adjoined the premises already described as occupied by the defendant consisted of a room used for storage, the boiler and furnace No. 1, while furnaces numbers 2, 3, and 4 were opposite the rear end of the premises occupied by Mr. Chase but separated therefrom by a space, measuring one and one-half to two feet in width, between the exterior walls of the buildings.

The furnaces were on the east side of the building wherein they were located. The next building east of the one in which the furnaces were contained was a double tenement house which fronted on South Main street, and extended from Silver to Coin streets; its western, or rear, wall for a distance of about fifty-six feet, from Silver street southerly was twenty-two feet distant from the furnace building of the defendant, and for a distance of about twenty feet from Coin street northerly was

only sixteen feet from the defendant's said building. In other words, there was a projection in the rear of the tenement house which made it six feet nearer to that part of the building containing furnaces numbered three and four than it was to the remainder of the building. The oven-room, where the products of the defendant's manufacture were baked, was directly over the furnace room, but there was no flooring between the furnaces and ovens which were directly over them; the floor between the furnace room and the oven-room stopped at the entrances to the ovens. Each oven had two iron doors, which were set in grooves and could be raised by handles with the aid of counter-weights. Rails were laid inside of the ovens, from the doors to the rear of the oven chambers, and between these rails were placed strips of sheet-iron, which could easily be sprung in or out, for the purpose of equalizing the heat in the oven. These rails supported trucks holding pans in which starch was baked. Oven number four was piped in such a manner that it was possible to carry hot gas from the furnace into and around the oven when required. To accomplish this purpose pipes had been connected with the chimney pipe at a point between the damper and the furnace bed, which after passing around the interior of the oven returned to the chimney pipe at a point beyond the damper, so that, when it was necessary to create in the oven the degree of heat required to bake starch, a temperature ranging from 220° to 300° Fahrenheit, according to the testimony, the damper would be closed and thereby the hot gas would be caused to circulate in and around the oven and from thence into the chimney by this indirect route, which was from twenty-five to thirty feet more than the distance from the furnace to the chimney through the chimney pipe.

Fifteen minutes before the explosion two men were working in the oven-room in front of the ovens, and had nearly filled all the pans provided to be use for that baking. Oven number four was to receive the first load. In the morning after the explosion one door of oven number four was found partly raised, bent over at the top and wedged in its groove, and the other

door was found lying on top of the oven together with part of the roof of the building. The interior of this oven was somewhat damaged at the top and to the right of the door nearest Coin street, and the heat-radiating pipes therein were found burst open at the joints. In a section of this pipe between the furnace and damper was found a corroded hole about two inches long and several smaller corroded holes large enough to admit the insertion of a lead pencil. The fire-box door was found closed; in the furnace bed there was a circle of unconsumed coal forming an outer rim of about four inches in width, while in the center was a circle of coal burned to ashes. The diameter of this furnace bed was fourteen inches. The damper in the chimney pipe was found partly closed. The oven-room was found to contain more or less wreckage, and brick from the outer wall in rear of the ovens was found in the alleyway adjoining the building. The plaintiff contended that the death of her husband was caused by the wrecking of the building through an explosion caused by the negligence of the defendant; that this explosion was the result of fire coming into contact with starch dust, which was shown to be present in large quantities upon the premises of the defendant, and also was shown to be highly explosive under certain conditions.

The defendant did not deny that there was an explosion of starch dust upon its premises, and that this explosion was the cause of the principal damage to the building, but it contended that the initial, and more violent, explosion occurred in the ship-chandlery shop of Mr. Chase, whence it was transmitted to the defendant's premises and caused the second explosion. No eye witness testified that the first explosion occurred in Mr. Chase's shop, but the theory of the experts who testified in behalf of the defendant is that the first explosion occurred in the shop of Mr. Chase and was the result of spontaneous combustion; that in the storage room of Mr. Chase were a great variety of highly inflammable and explosive substances, including tar, pitch, turpentine, rosin, kerosene, linseed oil, oakum, and solarine, a polish composed partly of naptha. No fire was kept in this storehouse, and the lantern used to illuminate the place was

generally lighted in the other store. If the first explosion occurred within the premises of Mr. Chase, hereinbefore described, and threw down a wall belonging to the same, which fell upon and killed Mr. Kearner, the plaintiff can not recover in this action; but if the deceased was crushed to death by fragments of a wall, in that portion of the building aforesaid, which was occupied by the defendant, which was thrust out upon him by the force of an explosion of starch dust which the defendant negligently had allowed to accumulate upon its premises in the building aforesaid, another, and a totally different, question would be presented. There are at least three theories that might be presented in explanation of the cause of the accident in this case: first, that the initial explosion occurred in the ship-chandlery shop upon the Chase premises and by direct action threw down the wall upon and thereby caused the death of the plaintiff's intestate. Second: that the first explosion occurred upon the premises of the defendant and either directly or indirectly, by means of another explosion, upset the wall which fell upon and killed the decedent; or, third, that the initial explosion occurred upon the premises of Mr. Chase, through spontaneous combustion or by reason of the negligence of Mr. Chase or otherwise, and communicated with and caused an explosion of starch dust upon the premises of the defendant whereby the walls which fell upon and killed Mr. Kearner were thrown down. As it appears that the portions of the building which fell upon and killed Mr. Kearner came from the premises of the defendant, probably from the walls of the second story, and not from the premises of Mr. Chase, it will be unnecessary to consider the first theory. The second theory is the one advanced in behalf of the plaintiff, and the third theory is that of the defendant. It was assumed by the court, as well as by the counsel for the respective parties, and in substance the jury were instructed, that if the third theory should be adopted by them, a verdict for the defendant must necessarily ensue. That is to say, that the doctrine of concurring causes is not applicable in the case of successive explosions communicated from the premises of one person to those of another. As the

jury found for the plaintiff, the question of the correctness of the assumption is not presented for our determination in the present case, and the same may be dismissed without further consideration.

In the trial of the case the parties advocated their respective theories aforesaid, and each offered evidence tending to support his own and to weaken that of his opponent. The efforts of the plaintiff in this behalf necessarily were limited by the scope of her declaration wherein she sets out the negligence of the defendant, resulting in the death of her husband, in six counts, the gist of which may be said to be the following: First. That the defendant allowed dangerous gases to accumulate and explode upon its premises. Second. That it allowed gas, fumes, and vapor to escape from the pipes of its furnace and ovens and to come into contact with starch dust in the oven-rooms and thereby cause an explosion. Third and sixth. That it failed to inspect the pipes leading from the furnaces to the ovens. Fourth. That it so managed its business as to cause an explosion. Fifth. That it allowed the air of the oven-room to become inpregnated with starch dust. By its plea of not guilty to each of said counts, the defendant put in issue the foregoing allegations of fact.

After verdict, the defendant duly filed its motion for a new trial; alleging therefor nine causes, as follows:

"First. Because the verdict is against the law and the evidence, and the weight thereof.

"Second. Because the testimony fails to show that the defendant was guilty of any negligence.

"Third. Because the testimony fails to show that the defendant was guilty of the negligence alleged against it in the several counts of the plaintiff's declaration.

"Fourth. Because the testimony fails to show that any negligence of the defendant, as alleged in the several counts of the plaintiff's declaration, was the proximate cause of the accident.

"Fifth. Because the plaintiff failed to sustain the burden of proof cast upon her by law.

"Sixth. Because the defendant fully met whatever burden was cast upon it by the doctrine of *'res ipsa loquitur,'* and no negligence on its part, as the proximate cause of the accident, appeared.

"Seventh. Because the testimony showed that the proximate cause of the accident was an event happening upon the premises of a third person, beyond the defendant's control, and for which the defendant was in no way responsible.

"Eighth. Because the damages awarded by the jury are not sustained by the evidence.

"Ninth. Because the damages awarded by the jury are excessive and unjust."

Said motion was denied by the justice of the Superior Court for the reasons contained in the following

## "DECISION.

"Brown, J. There is no reason to doubt, from the evidence, that the deceased lost his life as a result of the second explosion, which followed immediately after the first. The main contention is as to where the original explosion occurred; if upon the defendant's premises, the defendant is clearly liable; if upon the Chase premises, the defendant is as clearly not liable. The issue upon this point is complicated by a third explosion, which occurred about 30 minutes after the first. The walls of the buildings and the debris of the ruins were so disturbed by this explosion as to make any speculation as to the place of the original explosion, based upon the situation of the debris, of little value. Mr. Scott, who was present and saw the third explosion, testified that as a result of this explosion the remaining walls in the center of the front part of the building went into the street with pieces of machinery, and barrels and bags and things commenced to go into the street. It is not improbable that this explosion caused the roof to move, and this may account for the fact that the roof, which had been thrown up by the first explosions, lay somewhat to the east and projected over that side of the building after the third explosion. Both

Mr. Scott and Mr. Lincoln saw the lamp chimneys on the shelf attached to the partition wall between the Chase and defendant's premises after the explosion, also ropes coiled up and in order upon the floor of the Chase storage room after the explosion. If the original explosion had occurred in the Chase storage room, it would seem that these chimneys and ropes would have been disturbed. The defendant insisted that an explosion had occurred in the Chase storage room, and this caused the explosion on the defendant's premises, and attempted to account for an explosion at this place by spontaneous combustion of the highly combustible and inflammable material there, and offered expert testimony to the effect that such explosion was possible. Experts of repute gave it as their opinion that the original explosion occurred by reason of spontaneous combustion in the Chase storage room. The plaintiff offered expert testimony to the effect that in their opinion spontaneous combustion could not occur under the conditions prevailing in the Chase storage room at the time. Upon this issue the jury found for the plaintiff. The plaintiff offered expert testimony to the effect that in their opinion the original explosion occurred in one of the defendant's ovens, and as a result a flame was admitted to the oven-room where starch dust existed in large quantities, which was ignited, and that the explosion was produced in this manner.

"Upon all of the evidence, the court can not say it is clear that the jury was not warranted in finding for the plaintiff; nor is it clear that the damages are so grossly excessive as to warrant interference by the court.

"Motion for new trial is denied."

After the denial of its motion for a new trial the defendant filed its bill of exceptions, alleging twenty-three errors on the part of said justice in his rulings during said trial, to which the defendant had duly excepted, the exceptions now relied upon being:

"*First.* To the ruling of the trial justice denying the defendant's motion for a direction of a verdict for the defendant, which motion was made upon the ground that there was no

sufficient proof or evidence that the defendant was guilty of the negligence alleged against it in the several counts of the plaintiff's declaration, upon the ground that there was no sufficient evidence under the fourth count of said declaration to enable the plaintiff to invoke the principle of 'res ipsa loquitur,' and that even if said principle could have been properly invoked under said fourth count, the defendant fully met and satisfied by evidence any burden resting upon it by virtue of said principle,—upon the ground that the plaintiff failed to locate by sufficient evidence that the place of the original explosion was upon the premises controlled by the defendant:—and upon the ground that the testimony conclusively showed that the original explosion occurred on the premises not controlled by the defendant, and for which original explosion the defendant was not responsible,—to which ruling denying said motion the defendant duly excepted.

"*Second.* To the charge of the trial justice to the jury, instructing the jury as follows:

" 'There is a law which prevails in this State to the effect that where the cause or the instrumentality of the accident is under the control of the defendant, and an accident occurs, such as does not ordinarily occur when prudence and due care in the conduct of the business has been exercised, in such case the very fact that the accident has occurred is *prima facie* evidence of negligence on the part of the person under whose control the cause or this instrumentality existed when the accident occurred. So that, if you find by a fair preponderance of evidence in this case that this explosion, the original explosion, I mean, occurred upon the Tanner premises, and was under the Tanner control, in that case there is an inference, you are entitled to draw an inference, the law draws the inference, that the explosion was the result of negligence on the part of the defendant company, and the law imposes upon the defendant the burden of explaining away and freeing itself from the imputation of negligence, which arises from the very fact that the explosion occurred; and if the defendant has failed in your minds to explain away and to free itself from the imputation of

negligence which has arisen, in that case you will be justified under the law in inferring that the explosion occurred by reason of the defendant's negligence,' as shown on page 1034 and 1035 of the transcript of testimony,—to which ruling and instruction the defendant duly excepted, as appears on pages 1042 and 1043 of said transcript.

"*Tenth.*    To the ruling of the trial justice allowing question 294 on page 433 of said transcript to be answered, which ruling was erroneous in that said question was a hypothetical question to an expert for his opinion, for which there was no proper foundation previously lain, the question calling for an opinion upon an opinion,—to which ruling the defendant duly excepted, as appears on page 434 of said transcript.

"*Twelfth.*    To the ruling of the trial justice allowing question 53 on page 527 of said transcript to be answered, which ruling was erroneous in that no proper foundation for said question had been previously lain by any testimony, and in that the answer would tend to and did mislead the jury, to the prejudice of the defendant,—to which ruling the defendant duly excepted, as appears on page 527 of said transcript.

"*Thirteenth.*    To the ruling of the trial justice allowing question 70 on page 533 of said transcript to be answered, which ruling was erroneous in that no proper foundation had been lain for said question, that it called for an opinion based upon a mere assumption, and that its answer would and did tend to mislead the jury, to the prejudice of the defendant,— to which ruling the defendant duly excepted, as appears on page 533 of said transcript.

"*Fourteenth.*    To the ruling of the trial justice allowing question 87 on page 542 of said transcript to be answered, which ruling was erroneous for the same reasons as stated under the thirteenth exception above,—to which ruling the defendant duly excepted, as appears on page 542 of said transcript.

"*Fifteenth.*    To the ruling of the trial justice allowing question 89 on pages 542 and 543 of said transcript to be answered, which ruling was erroneous in that no proper foundation for said question had been previously lain, in that the answer called

for was merely an opinion based upon another opinion, and would and did tend to prejudice the defendant,—to which ruling the defendant duly excepted, as appears upon page 546 of said transcript.

"*Sixteenth.*  To the ruling of the trial justice allowing question 90 on page 546 to be answered, which ruling was erroneous for the same reasons as stated under the fifteenth exception above,—to which ruling the defendant duly excepted, as appears on page 546 of said transcript.

"*Seventeenth.*  To the ruling of the trial justice allowing question 92 on pages 546 and 547 of said transcript to be answered, which ruling was erroneous for the same reason as stated under the fifteenth exception above,—to which ruling the defendant duly excepted, as appears on page 547 of said transcript.

"*Ninteenth.*  To the ruling of the trial justice allowing question 72 on page 580 of said transcript to be answered, which ruling was erroneous for the same reasons as stated under the fifteenth exception above,—to which ruling the defendant duly excepted, as appears on page 580 of said transcript.

"*Twenty-third.*  To the ruling of the trial justice denying the defendant's motion for new trial, upon the grounds stated in said motion, to which ruling an exception was duly taken by the defendant."

The first exception is founded upon the denial of the trial justice to grant the defendant's motion for a direction of a verdict in its favor upon the ground that the plaintiff had failed to sustain her declaration by proof.

(1)    The defendant argues that the case at bar is not one in which the doctrine of *res ipsa loquitur* applies, and that even if it did, the defendant has borne the burden of explanation thereby imposed.  The defendant admits that the plaintiff's intestate came to his death without fault on his part, *i. e.*, while he was in the exercise of due care.  And it was fully proved that his death resulted from his being buried under debris composed of fragments from the building, used by the defendant as a starch

manufactory, which was wrecked by an explosion of starch dust therein.

As well-regulated starch manufactories do not ordinarily explode while the business therein is conducted with a reasonable degree of care, it would seem as though, after such an explosion has taken place and has caused the death of a person lawfully using the highway while ignorant of the danger to which he was exposed, it is not asking too much to require the proprietor to explain, for the benefit of the representatives of the deceased, the cause of such explosion. As the business is entirely within the control of the defendant and its methods of manufacturing starch may be good, bad, or indifferent, it is called upon to explain when a fatal explosion occurs within its premises. In our opinion, the case is included within the doctrine aforesaid. The defendant, being required to explain, offered as an explanation its theory, hereinbefore referred to, supported by the opinion of experts, that the first explosion occurred in the premises of Mr. Chase, and therefrom was communicated into the premises of the defendant; that this first explosion so entering its premises stirred up the starch dust therein and mixed it with the air, thus making it explosive, and having thus rendered the same highly dangerous, exploded it and caused the death and damage for which this suit is brought.

The explanation in effect is: we had within our premises sufficient quantities of all the constituent elements necessary to form a deadly explosive when combined, and, without our negligence, knowledge, or consent, and against our will, an outsider combined them and exploded the compound. The explanation and expert testimony in support of the same were submitted to the jury with testimony in behalf of the plaintiff tending to show that the initial explosion occurred in oven No. 4, upon the premises of the defendant, together with counter expert testimony for the plaintiff to the effect that spontaneous combustion was unlikely to occur under the conditions as they existed at that time of the year in the chandlery shop of Mr. Chase. The location of the origin of the explosion is a ques-

tion of fact, but until there is proof to the contrary it is fair to presume that it originated where it occurred, and the burden of explaining that it had its inception elsewhere is upon the defendant. As testimony was offered in support of each of said contentions, the question was properly left to be decided by the jury; and the defendant takes nothing by its exception. The ruling which is the subject of the second exception is a correct statement of the law. But the defendant objects to the application of the same to the case at bar, for the reason that the plaintiff has failed to prove that the first explosion originated on its premises.

The plaintiff did prove that the explosion which wrecked the building and threw fragments thereof upon and caused the death of the plaintiff's intestate occurred upon the premises of the defendant, and this proof coupled with the presumption heretofore alluded to, *i. e.*, that until there is proof to the contrary an explosion fairly may be presumed to have originated in the place where it occurred, were sufficient to justify the court below in its ruling. In our opinion, the exception has no merit.

In its consideration of the tenth, twelfth, thirteenth, fourteenth, fifteenth, sixteenth, seventeenth, and nineteenth exceptions the defendant has grouped them together because, as it says, practically the same questions arise.

The questions were as follows:

Question referred to in *tenth exception.* "Assuming that burning gas was formed in the oven and that there was an explosion of gas into the oven-room, what effect if any, would the explosion of this gas into the oven-room have upon the starch on the walls and rafters?"

Question referred to in *twelfth exception.* "If the door of the oven were open, and burning gas came out, would this cause any agitation in the air of the oven-room into which this burning gas came from the oven?"

Question referred to in *thirteenth exception.* "Now professor, if there was an explosive mixture of gas in one part of the oven and gas was present in other parts of the oven in

quantities which would not be explosive, would the explosion of gas in one part cause an explosion in the other part of the oven where the gas alone would not be explosive?"

Question referred to in *fourteenth exception.* "Now, if coal gas was present in explosive quantities and inflamed in one portion of the oven, what effect, if any, would that have upon the gas in other parts of the oven?"

Question referred to in *fifteenth exception.* "Now, assuming that there were two men at work in this room filling pans with starch, the starch being taken from burlap bags upon an iron scoop shovel with no cover on the top, and the starch the men were unable to get from the bags by means of the shovel was emptied from the bags into the pans by turning the bags inside out, and there was a hole in the pipe between the bed of the furnace and the damper about two inches in length and other smaller holes in the same pipe, and that the hole two inches in length was corroded, had a corroded edge, and there was a coal fire in the furnace box on the day of the explosion and before the explosion, and an explosion occurred,—to what, if anything, would you attribute this explosion?"

Question referred to in *sixteenth exception.* "Now, assuming that explosive gas, carbon monoxide, was formed in one of these ovens, and that there was an explosion of this gas into the oven-room, what effect, if any, would the explosion of the burning gas, or of the gas in the oven, have on the starch on the walls of the oven-room?"

Question referred to in *seventeenth exception.* "If the burning gas came into the oven-room and there was not a sufficient quantity of starch dust in the air of the oven-room, would the agitation of starch on the walls increase or diminish the amount of starch dust that would be present in the air of the oven-room?"

Question referred to in *nineteenth exception.* "If burning gas was present in the oven, and there was an explosion of gas into the oven-room, and there was starch dust on the walls of the oven-room, what effect, if any, would an explosion of burn-

ing gas in the oven, into the oven-room, have upon the starch on the walls?"

The defendant therefrom argues as follows: "The questions as propounded in these various forms assumed, as proven facts, that there was combustible gas in the oven on the day of the explosion; that there was burning gas in the oven; that there was gas in explosive quantities in the oven; that there was inflamed gas in one corner of the oven; that burning gas rushed out into the oven-room; that there was a gas explosion in oven No. 4. There were no facts upon which these hypothetical questions could be based. There was no proof that such a condition of things existed on the day of the accident or had ever existed.

"The plaintiff's method of proving her case, by experts, deserves attention and shows clearly the fundamental error in the admission of the questions which are the subject of the exceptions referred to.

"Mr. Scott testified that in his opinion combustible gases would be formed in the furnace, would escape through holes in the pipe, that in some way flame from the furnace might cause an explosion of this gas, and that when the door was opened the burning gas might rush into the oven-room. Scott's opinion was based on certain conditions alleged to have been found by him a day or two after the explosion.

"The plaintiff then addressed a series of hypothetical questions to her experts Martin and Groff, and used this highly speculative opinion of Scott as a foundation for such questions. In other words what had been a mere matter of opinion with Mr. Scott was assumed, in the questions to Martin and Groff, to be proven facts in the case, and their opinions were given on such assumptions.

"There was no testimony that, as a matter of fact, any combustible gas was forming on the day of the explosion; that there was any escaping; that there was any combustible gas in the oven or any explosion in the oven or any part thereof.

"All these things Mr. Scott deduced from conditions as he claimed he saw them some time afterwards, and yet, notwith-

standing that they were mere possibilities, they were made to do duty as proven facts with the plaintiff's experts.

"It is needless to say that such a method of establishing a case by basing the opinion of one expert on that of another is clearly erroneous.

"The rule is clearly set forth in Lawson, Expert Evidence, (2nd ed.) p. 172: "It is not proper in asking hypothetical questions to incorporate in them the opinions of other expert witnesses. An opinion of an expert witness cannot be based upon opinions expressed by other experts. Facts and not opinions must be assumed in the questions. If it were otherwise, opinions might be built upon opinions of experts and the substantial facts driven out of the case. An opinion cannot rest in whole or in part, on other opinions but must rest on facts.'

"In *McDonald* v. *R. I. Co.*, 26 R. I. 467, the court held, that even on cross examination, it was not proper to put a hypothetical question to an expert which involved an assumption concerning which no evidence had been offered.

"*Williams* v. *State*, 64 Md. 384, the issue under an indictment for murder involved whether or not the deceased had his neck broken.

"Defendant's counsel propounded a question to a physician, who was testifying as an expert, and included in the question the inference or opinion of a previous expert witness, a physician. *Held* inadmissible, the court saying: 'Now while an expert may give his opinion upon facts, assumed to have been established, it would be against every rule and principle of evidence to allow him to state his opinion upon the conclusions and inferences of witnesses. Here the witness was not asked his opinion in regard to the dislocation of the neck of the deceased, based on the failure of Dr. Gill, who conducted the examination, to reproduce crepitation, but based also upon the conclusions of Dr. Gill in regard to the subject matter of inquiry. For this reason the question was clearly objectionable.' See also *R. R. Co.* v. *Falvey*, 104 Ind. 409; *Lawson* v. *Crane & Hall*, 74 Atl. 641 at 642 (Vt. 1909).

"The admission of these questions in the case as bar was not only error but was highly prejudicial to the defendant.

"The question as to whether or not there had been an explosion of gas in oven No. 4 was an important point in the case.

"The reiterated questions containing unwarranted assumptions, founded on the opinion of Scott, and the answers thereto, must have impressed the jury that such conditions had been proved to exist as a matter of fact."

Wherefrom the defendant concludes that the admission of these questions clearly constitutes reversible error.

The objections made by the defendant to the questions aforesaid are, first, to the method of establishing a case by basing the opinion of one expert upon that of another; and, secondly, that the reiterated questions containing unwarranted assumptions, founded on the opinion of Scott and the answers thereto, must have impressed the jury that such conditions had been proven to exist as a matter of fact. The objection, under the rule laid down in Lawson, Expert Evidence, *supra*, that a question bases the opinion of one expert upon that of another necessarily must be to the form of the question itself, and also must be determinable from a mere inspection of the same, as, for instance, if the question had been: "If Professor Blank is of the opinion that such is the fact, what is your opinion?" The questions objected to contain no intrinsic evidence that one opinion is sought to be based upon another. And it is impossible to determine whether or not such is the fact without examining and analyzing the testimony in the case, a duty which we are not required to undertake in the consideration of exceptions to the form of questions.

(3)    Professor Wigmore, in that portion of his comprehensive work on evidence, section 672, relating to hypothetical questions, asserts that the hypothetical question to an expert, as to the data for inference, takes the place of the question to the bystander whether he was in a position to observe the affair which is the subject of investigation. As he says, "The reasoning may be explained in the following propositions: 1. Testimony

in the shape of inferences or conclusions *rests always on certain premises* of fact.  That which has been called observation, serving as the basis of belief in matters directly cognizable by the senses—as, the facts of an affray, a conversation, a trespass, and the like—is here replaced by what may be called a consideration of the premises.  Just as observation of the situation or affair or surroundings, is in the one case essential to the formation of a witness's belief based on his senses, so a consideration of specific data is essential to the formation of an inference or conclusion or opinion.  If the witness has not considered or had in mind these premises, his inference or opinion is good for nothing.  2. *These premises*, a consideration of which is suggested to the formation of the conclusion or opinion, *must somehow be supplied by testimony.*  The same witness may supply both premises or conclusion; or one witness may supply the premises and another the conclusion.  The two are not necessarily connected.  3. If the latter method is chosen, and a witness is put forward to testify to the conclusion, *the premises considered by him must be expressly stated, as the basis of his conclusion;* otherwise, since his conclusion rests for its validity upon a consideration of the premises, and since the tribunal may later decide that certain premises are not proved and may thus reject them, it must, before accepting his conclusion, have the means of knowing whether it is based on a consideration of premises accepted as true by the tribunal.  If those premises are not made to accompany the conclusion, the tribunal might be accepting a conclusion for which the witness had considered premises found by the tribunal not to be true.  4. Hence, *the premises must be stated hypothetically in connection with the conclusion;* then, by other testimony, the material for determining the truth of the assumed premises may be furnished to the tribunal.  The key to the situation, in short, is that there may be two distinct subjects of testimony,—premises, and inferences or conclusions; that the latter involves necessarily a consideration of the former; and that the tribunal must be furnished with the means of rejecting the latter if upon consultation they determine to reject the former, *i. e.*, of distin-

guishing conclusions properly founded from conclusions improperly founded."

The objection that the jury must have been improperly impressed by the reiterated questions is untenable. A similar objection was considered by Shaw, C. J., in *Dickenson* v. *Fitchburg*, 13 Gray, 546 (1859); "But it is objected that the admission of this evidence would open the door to evidence entirely incompetent, by allowing the witness to state the facts on which the opinion is founded, facts not proved by competent evidence.

"This objection seems to us to be founded on a misconception of the manner in which the investigation is to be conducted, and the testimony of experts received and applied. It assumes that the facts will be taken to be true, because the witness has stated that he founds his opinion upon them. But this is quite a mistake. In order to obtain the opinion of a witness on matters not depending upon the general knowledge, but on facts not testified of by himself, one of two modes is pursued: either the witness is present and hears all the testimony, or the testimony is summed up in the question put to him; and in either case the question is put to him hypothetically, whether, if certain facts testified of are true, he can form an opinion, and what that opinion is? The jury will then be instructed, if the truth of any such fact is contested, first to consider whether the fact on which such opinion rests is proved to their satisfaction; if it is, then to give such weight to the opinion resting on it as it deserves; but if the fact is not proved by the evidence, then to give the opinion no weight. This is necessary to enable the jury, upon the true theory of jury trial, to decide all questions of fact, upon competent evidence laid before them. *M'Naghten's case*, 10 Cl. & Fin. 200.

"But the consideration submitted in the argument in opposition to this view, namely, that the opinion may be given on the assumption of facts not proved, is a strong additional reason why the grounds and reasons of the opinion should be stated, in order that the jury may see that it is not founded on hearsay, general rumor, or facts of which some evidence may have been

given, but, being controlled by other evidence, are not found true by the jury. This inquiry has been more frequently made in cross-examination, yet we are of the opinion that it is competent evidence in chief. It is in fact this general knowledge, on the specific .facts judicially proved, from which the jury draw their ultimate conclusion, though in matters of science they may be aided by the more exact observation and the larger experience of the trained expert. *Keith* v. *Lothrop*, 10 Cush. 453."

In *Forsyth* v. *Doolittle*, 120 U. S. 77, the Supreme Court approved a charge to the jury containing the following: "You must readily see that the value of the answers to these questions depends largely, if not wholly, upon the fact whether the statements made in these questions are sustained by the proof. If the statements in these questions are not supported by the proof, then the answers to the questions are entitled to no weight because based upon false assumptions or statements of facts."

This brings us to the consideration of the twenty-third, and last, exception of the defendant, which was taken to the refusal of the trial justice to grant the defendant's motion for a new trial upon any of the nine grounds therein set forth. Those relating to damages have not been urged before us, and are therefore deemed to have been abandoned. The other grounds, that the verdict is against the law and the evidence and the weight thereof in that the plaintiff has failed to make out her case by a fair preponderance of the evidence, and that the defendant has borne the burden, imposed upon it by the law, of explaining its freedom from negligence in the explosion, and the claim of the defendant that the testimony showed that the proximate cause of the accident was beyond its control and upon the premises of a third person, already have been considered. This is a case in which the doctrine of *res ipsa loquitur* is peculiarly applicable. An explosion occurred upon the premises of the defendant; starch dust from starch which had been treated with ·nitric acid was present in quantities; the manager of the defendant company did not know that starch dust was explosive, as appears from the following extract from

the testimony of Walter Lowe, called as a witness by the plaintiff: "Q. 3. What is your business? A. Superintendent of the Charles S. Tanner Company. Q. 4. How long have you been superintendent? A. About seven years, seven or eight years. Q. 62. Are you familiar with the chemical properties of starch and other substances which are manufactured at the Tanner place? A. No, sir; I only understand what we manufacture. Q. 63. But do you understand the chemical properties of what you manufacture? A. No, sir. Q. 64. Is there anybody, or was there anybody at the Tanner place on February 12th, that understood the chemical properties of starch? A. No, sir." (but upon objection the question was again read to him, and he then answered: "I don't know.") "Q. 318. Now, is it a fact that nitric acid was used in the starch at the factory? A. It is used when occasion demanded it. Q. 319. And who had to do with putting nitric acid in the starch? A. I had the measuring out and fixing it up. Q. 320. And you made the solution of nitric acid? A. I made a solution that went on the starch. Q. 321. Did you know at that time that starch mixed with nitric acid created an explosive, very explosive substance? A. No, sir;" no precautions were taken to prevent the accumulation of starch dust or to take care of the same; the men employed were forbidden to light matches upon the premises, but this was a precaution against fire, and not against an explosion; great heat was maintained in the furnace and ovens (from 220° to 300° Fahrenheit, as hereinbefore stated); and at times, upon opening the oven-doors, men had their jumpers scorched by the heat; and one of them claimed by flame from the oven; at the time of the explosion, flames were seen to come from the oven-room; firemen testified to other explosions on the same premises during the times of fires which they had been called to extinguish. The defendant's business premises contained the potentiality of explosions. To offset the evidence above set forth the defendant showed a lot of inflammable material capable of spontaneous combustion, under the temperature and conditions favorable thereto, in the Chase ship-chandlery shop

which already has been described quite fully. But there was no fire or light kept therein; there had never been an explosion there; there had never been fire there before, so far as appears in evidence.

As we have already said, the question of the place of origin of the explosion was a question of fact, and the same was properly submitted to the jury under suitable instructions. The jury rendered their verdict, and the same has been approved by the judge before whom the case was tried. We see no reason for disturbing the same. The doctrine approved in the case of *Wilcox* v. *The Rhode Island Company*, 29 R. I. 292, is applicable in the case at bar. For these reasons the defendant's exceptions are overruled, and the case is remitted to the Superior Court with direction to enter judgment on the verdict.