Richard PARRILLO

v.

GIROUX COMPANY, INC., et al.

No. 78–410–Appeal.

Supreme Court of Rhode Island.

March 11, 1981.

Louis Baruch Rubinstein, Abedon, Michaelson, Stanzler, Biener, Skolnik & Lipsey, Howard I. Lipsey, Providence, for plaintiff.

Rice, Dolan, Kiernan & Kershaw, Leonard A. Kiernan, Jr., Providence, for defendants.

## OPINION

KELLEHER, Justice.

This is a Superior Court civil action in which the plaintiff, Richard Parrillo (Parrillo), seeks to recover damages for injuries alleged to have occurred when a bottle of grenadine he was opening exploded. The defendants are Giroux Company, Inc. (Giroux), the manufacturer of the syrup, A–W Brands, Inc. (A–W Brands), the parent company of Giroux, and Giroux's local distributor, Providence Beverage Company (Providence Beverage). The trial justice dismissed the four-count complaint (negligence, strict liability, res ipsa loquitur, and breach of implied warranty) in regard to A–W Brands and directed a verdict in favor of Giroux and Providence Beverage on all the other counts except the claim for strict liability. The jury then returned a verdict for Giroux and Providence Beverage. Parrillo's appeal is presented against a simple but interesting factual background.

The incident precipitating this litigation occurred on February 9, 1973. At that time, Parrillo was working as a bartender in Warwick, Rhode Island, at the Barnsider Restaurant. He arrived at work at 9:30 a. m. in order to prepare the bar for an 11:30 a. m. opening. Parrillo testified that his activities during this two-hour period included stocking the bar with liquor and fruit. Supplies for the area were stored in a caged-off area in the kitchen. At approximately 4:30 p. m., a waitress came to the service area of the bar and ordered a variety of drinks, including a Singapore Sling.

One of the ingredients of a Singapore Sling is grenadine.[1]

Parrillo testified that there was insufficient grenadine in the open bottle to make the drink. This deficiency caused him to take from a cabinet behind the bar another bottle of Giroux grenadine. According to Parrillo, he "took the bottle out with my right hand, set it on the bar, took the seal off the top. There's a little seal around the top. As soon as I started to open, taking the cap off—it's a screw cap—it just exploded." Parrillo saw blood flowing from his finger and put a towel around it. He was unable to stem the flow of blood and was driven to the Kent County Hospital by another employee.[2]

Louis Perlman (Perlman), vice president of sales for A–W Brands, explained that Giroux manufactured only the syrup; the bottles were purchased from another company. Perlman then went on to describe the bottling process, which included a visual inspection before the bottles were placed in a carton for shipment to the distributor. Of the 4,800 to 5,600 bottles of grenadine which were packaged each day, Perlman estimated that approximately twelve were discarded because of defects. Some of the bottles were not sealed properly, and others were rejected because they did not contain the proper amount of syrup. He added that he had never heard of a bottle of Giroux grenadine exploding.[3]

Medical testimony presented at trial indicated that Parrillo was hospitalized twice. The first occasion was for the treatment of a laceration of the right index finger and minor surgery in which the flexor tendons and the digital ulnar nerve were joined and sutured. Later, the numbness in the palm side of the index finger caused Parrillo to seek the assistance of a plastic surgeon. The plastic surgeon concluded that Parrillo had suffered a permanent 12 percent loss of use of the injured digit.

Giroux presented an expert witness, Frank Dolyak, a professor of biology at Rhode Island College and a specialist in immunology. He testified that, based upon his experience, it would have been impossible for the syrup contained in the bottle to cause the explosion. He based his conclusion primarily on the fact that the syrup has a very high acidity level, making it virtually impossible for any type of bacteria to survive. On cross-examination Professor Dolyak conceded that he did not perform any tests on the bottles used by Giroux to package the syrup.

The issues raised by Parrillo relate to the trial justice's charge on Parrillo's strict-liability claim and the direction of verdicts on his res ipsa loquitur and breach-of-warranty claims as well as the directed verdict in regard to all claims against A–W Brands. The directed verdicts were entered after Parrillo had concluded his presentation of evidence.

### Strict Liability

■ Prior to the development of the so-called strict-products-liability doctrine, the principal avenues by which an individual could seek damages for injury caused by a defective product were actions grounded in negligence law, most frequently under the doctrine of res ipsa loquitur, or by way of a suit alleging a breach of implied warranty. However, those roads to recovery were by no means stretches of open highway. There existed numerous obstacles that frequently precluded recovery. For example, in a negligence action, it might well be impossible for a plaintiff to demonstrate that a particular defendant was responsible for the injury or that proper inspection would have revealed the defect. Similarly, in a breach-of-warranty situation, recovery might be prevented by lack of "privity" between the manufacturer and the plaintiff

---

1. Parrillo listed the ingredients of a Singapore Sling as gin, lemon, sugar, cherry brandy, and grenadine.

2. The waitress testified and generally corroborated Parrillo's testimony.

3. Maurice Seltzer, office manager for Providence Beverage Company, testified that his company had purchased grenadine from Giroux and delivered it to the Barnsider.

or lack of proof of reliance upon the warranty by the plaintiff.

It was in response to these obstacles that the doctrine of strict liability in tort for defective products has been developed. This court examined the issue of strict products liability in *Ritter v. Narragansett Electric Co.*, 109 R.I. 176, 283 A.2d 255 (1971). In *Ritter*, we formally adopted the doctrine was explicated in Restatement (Second) *Torts* § 402A at 347–48 (1965)[4] and we suggested that the doctrine

"contemplates first, that there must be a defect in the design or manufacture which makes the product unsafe for its intended use, and second, that liability does not attach unless the plaintiff was using the product in a way which it was intended to be used when he was injured by it. Under the doctrine of strict liability in tort for defective design, it is immaterial whether the manufacturer was negligent in creating the design or exercised all reasonable care in the creation of the design. If a defect appears in the product in spite of all reasonable care exercised by the manufacturer, he is liable just the same." *Ritter v. Narragansett Electric Co.*, 109 R.I. at 190, 283 A.2d at 262.

In his charge to the jury, the trial justice, after relating instances of what he described as "automatic liability," observed that the strict-products-liability doctrine relied upon by Parrillo might properly be referred to as "liability for defective products." He then went on to explain the doctrine and told the jury:

"If a manufacturer or supplier or seller of a product puts that product on the market and there is a defect in that product which makes the product unreasonably dangerous, when that product is being used in a normal manner and that defective product causes injury to someone, then the manufacturer or supplier or seller is called upon to respond in damages."

On two subsequent occasions within the charge, the trial justice embellished these remarks as he discussed with the jury such issues as the burden of proof and the necessity of proximate cause. At the conclusion of the charge, Parrillo's counsel objected to what he described as an omission of one element of the doctrine. He described the omission as the trial justice's failure to tell the jury that the doctrine was applicable even though Giroux or Providence Beverage might have demonstrated that they had used all reasonable care in the preparation and distribution of the bottled grenadine. The trial justice explained the omission by informing counsel that the so-called omitted element plays no part in an action based upon the strict-liability doctrine. We see no reason to fault the trial justice.

 *Ritter* makes it patently clear that the exercise of all reasonable care in the creation and distribution of a product is completely irrelevant. Strict liability in tort arises because of a defect in the product rather than on the basis of negligent management. The doctrine is applicable even though all possible care was exercised in the preparation of the product. *Teagle v. Fisher & Porter Co.*, 89 Wash.2d 149, 570 P.2d 438 (1977). When the charge is read in its entirety, it is clear that the jury well understood what were the relevant issues to be resolved as it considered the strict-liability count.

### Implied Warranty

Parrillo contends that the trial justice erred when he dismissed the implied-war-

---

**4.** Restatement (Second) *Torts* § 402A at 347–48 (1965) states:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

ranty count of the complaint[5] for Parrillo's failure to comply with the notice provisions of G.L.1956 (1969 Reenactment) § 6A–2–607.[6] The trial justice ruled that Parrillo had not, as a matter of law, notified defendants of the breach within a reasonable period of time. In dismissing the implied-warranty count, the trial justice stated:

"a fair reading of [G.L.1956 (1969 Reenactment) § 6A–2–607] would lead one to conclude that it is a condition precedent to maintaining an action for breach of warranty that the plaintiff prove that the reasonable notice was given. In this case there has been no such proof. The only evidence in this case is that some form of notice was given to the defendants. The defendants acknowledged that, but there is absolutely no evidence as to when that notice was given and what that notice contained * * *."

■ The question of what constitutes a reasonable time in which to give notice of breach is ordinarily a question of fact; when the facts are undisputed and only one inference can be drawn from those facts, the question becomes one for the courts. *San Antonio v. Warwick Club Ginger Ale Co.*, 104 R.I. 700, 248 A.2d 778 (1968). In the case at bar, the facts are undisputed. The only evidence pertaining to notice was an admission by Giroux and Providence Beverage that a claim was presented by an attorney for Parrillo. No evidence whatsoever was presented by Parrillo which would indicate he had complied with the mandate set forth in § 6A–2–607. Consequently, we cannot fault the trial justice's action.

■ Before leaving this issue, we wish to offer a brief comment on a position taken by Giroux and Providence Beverage in defending the trial justice's dismissal of the warranty claim. They take the position that the warranty claim had become merged with Parrillo's strict-liability claim. We do not subscribe to this merger theory and have expressed the opinion that strict liability and implied warranty are parallel theories of recovery, one in contract and the other in tort, with each having its separate analytical elements and procedural conditions precedent. *Romano v. Westinghouse Electric Co.*, 114 R.I. 451, 458, 336 A.2d 555, 559 (1975). If litigants seek to prevail by relying on alternate theories of recovery, they may; but in so doing, they must touch all the bases as they present each theory.

### Res Ipsa

■ The Latin expression *res ipsa loquitur* became part and parcel of legal jargon because of a remark made by Chief Baron Pollock as the defendant's counsel attempted to show cause why a judgment for fifty pounds sterling should not be entered for the plaintiff in *Byrne v. Boadle*, 2 H. & C. 722, 725, 159 Eng.Rep. 299, 300 (1863), where the court was concerned with the plight of a plaintiff pedestrian who was struck by a barrel of flour which rolled out of an open window of the defendant's warehouse. As the defendant's counsel was arguing that "there was not a scintilla of evidence [of negligence], unless the occasion is of itself evidence of negligence," the Chief Baron interjected, "There are certain cases of which it may be said res ipsa loquitur, and this seems one of them." Consequently, notwithstanding an inability to show why the barrel rolled out the window,

---

5. The implied-warranty section of G.L.1956 (1969 Reenactment) § 6A–2–314 reads, in pertinent part, as follows:

"(1) Unless excluded or modified (§ 6A–2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. * * *

"(2) Goods to be merchantable must be at least such as

 * * * * * *

(c) are fit for the ordinary purposes for which such goods are used; and

 * * * * * *

(e) are adequately contained, packaged, and labeled as the agreement may require * * *."

6. General Laws 1956 (1969 Reenactment) § 6A–2–607(3)(a) states, "[T]he buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." This section succeeded G.L.1923, ch. 307, § 9, of the Uniform Sales Act.

the judgment for Byrne was sustained upon a showing that the defendant was in possession of the warehouse. In essence, the court ruled that negligence and causation might be established by circumstantial evidence.

Recently, in *Montuori v. Narragansett Electric Co.*, R.I., 418 A.2d 5, 11, 12 (1980),[7] in attempting to unravel the overlap, so called, between the doctrines of res ipsa loquitur and exclusive control, we noted that in 1891 the court, apparently for the first time, in *Cox v. Providence Gas Co.*, 17 R.I. 199, 200, 21 A. 344, 344–45 (1891), recognized that "the happening of the accident may in itself amount to *prima facie* evidence of negligence, when the cause or instrumentality of the accident is under the defendant's control, and when such an accident does not ordinarily occur if due precautions be taken * * *."

Later, the cases of *Kearner v. Charles S. Tanner Co.*, 31 R.I. 203, 214–15, 76 A. 833, 837 (1910), and *LaForrest v. O'Driscoll*, 26 R.I. 547, 550, 59 A. 923, 925 (1905), referred to the principle enunciated in *Cox* as the "doctrine of *res ipsa loquitur*." Subsequently, in *Kilgore v. Shepard Co.*, 52 R.I. 151, 154, 158 A. 720, 721 (1932), Nina M. Kilgore's effort to rely on the doctrine to recover damages for injuries sustained when a chair furnished by the defendant collapsed just as she was about to sit in it went for naught because, according to the court, at the time of the injury the chair was under "her exclusive control" rather than that of the party charged with neglect.

In *Goyette v. Sousa*, 90 R.I. 8, 16–17, 153 A.2d 509, 514 (1959), the court defined "exclusive control" as "a sufficiently complete domination over the instrumentality as to exclude the probability that any agent other than the particular defendant could have caused the injury." The court went on to say that the

"defendant's domination of the instrumentality must reasonably indicate that regardless of what happened the defendant knew the condition of the instrumentality and knew what went wrong. * * * It must appear from the evidence that no agent other than the defendant was in a position to participate in the act or omission which constituted the negligence."

The Goyettes, a married couple, were seeking to recover damages for injuries sustained by Mrs. Goyette when her leg penetrated the rusted metal deck of a pontoon used as a mooring place by shellfishermen who would take their wares ashore and sell them to the defendant, who was a fish wholesaler. The court ruled that the Goyettes could not take advantage of the doctrine of exclusive control because the evidence did not show such a control "which would exclude the likelihood that some other agent participated in the cause of the injury." *Goyette v. Sousa*, 90 R.I. at 17, 153 A.2d at 514.

In the case at bar, the trial justice, in directing a verdict on Parrillo's res ipsa loquitur count, alluded to the definitional portion of *Goyette* and offered the following observation:

"The only thing the Court can conclude is that the grenadine bottle that exploded in the plaintiff's hands was in the custody and control of the Barnsider for at least several months. * * * I think that we can all imagine that any number of things could have happened to that bottle in transport and while in the possession of the Barnsider such as something falling on it, something hitting it at the neck or some other thing which could have caused weakness. This leads me to conclude that there has been an insufficient showing of exclusive control by the plaintiff here to justify the use of res ipsa loquitur and a charge to the jury on that point."

We believe, for the reasons that follow, that the trial justice, by his reliance on *Goyette*, has placed an undue burden on Parrillo.

---

7. In *Montuori v. Narragansett Electric Co.*, R.I., 418 A.2d 5 (1980), after tracing the development of res ipsa loquitur in this jurisdiction, we

concluded that the so-called doctrine of exclusive control is but a component of the doctrine of res ipsa loquitur.

Dean Prosser, after pointing out that a defendant's negligence does not have to be proved beyond a reasonable doubt, explains that, in dealing with the requirement of exclusive control, there is no necessity for a plaintiff to eliminate all other possible causes of the accident. All that is required is that the plaintiff produce sufficient evidence from which a reasonable man could say that, on the whole, it was more likely than not that there was negligence on the part of the defendant. Prosser refers to the *Kilgore* case as a perfect example of one of the instances in which a strict application of the exclusive-control requirement has led to "ridiculous conclusions"; and "control," he said, if it is not to be "pernicious and misleading," must be considered as a "very flexible term." Prosser, *Law of Torts* § 39 at 218–224 (4th ed. 1971).

Again, in 2 Harper and James, *The Law of Torts* § 19.7 (1956), the authors stressed that in order to show exclusive control, the possibility of other causes does not have to be eliminated completely, but their likelihood must be so reduced that the jury can reasonably find that the negligence, if any, lies at the defendant's door.

Today, a myriad of cases exists which hold that there is nothing in the doctrine's rationale that (1) requires the defendant to have actual physical control at the time of the injury [8] or (2) requires a plaintiff to eliminate completely the possibility of other causes for the injuries sustained.[9] A decade ago a distinguished jurist, Edward W. Day, then Chief Judge for the United States District Court for the District of Rhode Island, offered the following response to a manufacturer who claimed that a plaintiff could not rely upon res ipsa loquitur because the manufacturer had relinquished control of its product once it was sold to the wholesaler:

"If the defendant's argument were accepted, a consumer could never sue a manufacturer on a theory of res ipsa loquitur because the manufacturer never retains exclusive control over its product throughout the distributive process. Numerous courts have allowed consumers to sue a manufacturer on the theory of res ipsa loquitur for personal injuries suffered as a result of defects in products of which the consumer had physical possession at the time of injury where there was no indication that any other handler of the product before it reached the consumer had contributed to said injury. * * In addition the plaintiffs may at trial offer proof to negative the possibility of any improper handling which might have altered the condition of the pills involved herein." [citations omitted] *Oresman v. G. D. Searle & Co.*, 321 F.Supp. 449, 554–55 (D.R.I.1971).

In seeking to delineate the limits of the exclusive-control factor, Judge Day relied upon comment (g) to Restatement (Second) *Torts* § 328(D). The Chief Judge wrote prior to a time when this court, by its adoption of Rule 12, had agreed to render advisory opinions to the United States courts operating within the First Circuit. However, we do believe that Judge Day has blazed a trail that has been followed by others, specifically, the Pennsylvania Supreme Court's holding in *Gilbert v. Korvette's Inc.*, 457 Pa. 602, 327 A.2d 94 (1974), where the court adopted § 328(D) in its entirety.

**8.** *Jackson v. H. H. Robertson Co.*, 118 Ariz. 29, 32, 574 P.2d 822, 825 (1978); *Metz v. Central Illinois Electric and Gas Co.*, 32 Ill.2d 446, 450, 207 N.E.2d 305, 307 (1965); *Oak Leaf Country Club v. Wilson*, 257 N.W.2d 739, 744 (Iowa 1977); *Mets v. Granrud*, Mont., 606 P.2d 1384, 1387 (1980); *Gierach v. Snap-on Tools Corp.*, 79 Wis.2d 47, 53, 255 N.W.2d 465, 467 (1977).

**9.** *Bedford v. Re*, 9 Cal.3d 593, 510 P.2d 724, 108 Cal.Rptr. 364 (1973); *Zimmer v. Celebrities, Inc.*, Colo.App., 615 P.2d 76, 79 (1980); *Quin v. George Washington University*, 407 A.2d 580, 584 (D.C.1979); *Bias v. Montgomery Elevator Co. of Kansas, Inc.*, 216 Kan. 341, 344, 532 P.2d 1053, 1056 (1975); *Harford v. Lloyd E. Mitchell Co.*, 269 Md. 64, 71, 304 A.2d 234, 239 (1973); *Walsh v. Phillips*, 399 S.W.2d 123, 128 (Mo. 1966); *American Elevator Co. v. Briscoe*, 93 Nev. 665, 669, 572 P.2d 534, 537 (1977); *Dillon v. William S. Scull Co.*, 164 Pa.Super. 365, 369, 64 A.2d 525, 527 (1949); *Mobil Chemical Co. v. Bell*, 517 S.W.2d 245, 251 (Tex.1974); *Joly v. Coca-Cola Bottling Co. of Rutland*, 115 Vt. 174, 180, 55 A.2d 181, 186 (1947); *Hoven v. Kelble*, 79 Wis.2d 444, 451, 256 N.W.2d 379, 384 (1977).

Past preoccupation with the exclusive-control requirement has caused this court to lose sight of the fact that exclusive control, like Chief Baron Pollock's reference to "res ipsa loquitur," merely gives recognition to the fact that circumstantial evidence can afford an appropriate and adequate evidentiary foundation for recovery in a negligence action. The time has come that Rhode Island courts, when considering the exclusive-control factor, deemphasize the semantic and exercise the common sensical. It is our considered judgment that the evidentiary rule expressed in § 328(D) of the Restatement (Second) *Torts* (1965) supplies a far more logical and orderly approach to circumstantial proof of negligence than has been formerly employed in this jurisdiction.

Section 328(D), entitled "Res Ipsa Loquitur," provides:

"(1) It may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when

(a) the event is of a kind which ordinarily does not occur in the absence of negligence;

(b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and

(c) the indicated negligence is within the scope of the defendant's duty to the plaintiff.

"(2) It is the function of the court to determine whether the inference may reasonably be drawn by the jury, or whether it must necessarily be drawn.

"(3) It is the function of the jury to determine whether the inference is to be drawn in any case where different conclusions may reasonably be reached."

To the extent our prior decisions are inconsistent with § 328(D), they are no longer to be followed.

The Restatement disavows the requirement of exclusive control. A party's negligence may be inferred when "other responsible causes * * * are sufficiently eliminated by the evidence." Restatement (Second)

*Torts* § 328(D)(1)(b) (1965). Exclusive control may eliminate other causes, but the critical inquiry is not control, but whether a particular defendant is the *responsible cause* of the injury. Restatement (Second) *Torts* § 328(D), comment g at 161 (1965).[10] Again, however, the plaintiff is not required to exclude all other possible conclusions beyond a reasonable doubt, and it is enough that he make out a case from which the jury may reasonably conclude that the negligence was, more probably than not, that of the defendant.

Since we are concerned here with the grant of a motion for a directed verdict on the res ipsa count, we must view the evidence adduced up until the time of the motion in the light most favorable to Parrillo, drawing therefrom all the reasonable inferences that will support his claim, taking care neither to weigh the evidence nor to pass upon the credibility of the witnesses. *DaVinci Creations, Inc. v. Nu-Frame Co.*, R.I., 418 A.2d 851 (1980); *Carnevale v. Smith*, R.I., 404 A.2d 836 (1979). The record indicates that both Parrillo and the waitress testified that the grenadine bottle exploded. It also discloses that Providence Beverage's trucks traveled to Giroux's New York plant where they picked up cardboard cases filled with grenadine bottles and returned the cargo to Rhode Island. Providence Beverage then delivered cardboard cartons containing grenadine bottles separated by individual pieces of cardboard to the Barnsider Restaurant where Providence Beverage employees unloaded the cases and took them into the kitchen's caged storage area. The grenadine bottles remained in this storage area in their cardboard cartons until Parrillo took the bottles out of the cartons and placed them in the closed cupboard at the rear of the bar as "back up" to be used when the bottle in use was empty.

Parrillo had told the jury that in his fifteen years of tending to the thirst needs of the public, he had never experienced any prior problems with opening the bottles of grenadine, and the waitress who witnessed the mishap also reported that Parrillo did

**10.** See Appendix.

not accidentally hit or strike the grenadine bottle on the bar as he was attempting to open it. We are of the opinion that this evidence, viewed in its totality, if considered by the jury, presented an evidentiary basis upon which the jury could find that Parrillo's injuries resulted from the failure on the part of one of Giroux's employees to spot a defect in the bottle as the bottles[11] passed in review after a tour along an automated assembly line. We see no evidence that would support a verdict so far as Providence Beverage's negligence is concerned.

### Claim against A–W Brands

▆▆▆▆ Parrillo claims that the trial justice erred when he dismissed all claims against A–W Brands because of a lack of evidence connecting the parent company with the transactions giving rise to this litigation. Although it is not disputed that A–W Brands is the parent company of Giroux, there was no evidence adduced at trial which suggested that it dominated the finances, policies, and practices of Giroux; and absent such proof, courts will generally respect the independent character of each corporation. *See e. g. Team Central, Inc. v. Teamco, Inc.,* 271 N.W.2d 914 (Iowa 1978); *Gentry v. Credit Plan Corp. of Houston,* 528 S.W.2d 571 (Tex.1975). The mere fact that there exists a parent-subsidiary relationship between the two corporations is insufficient cause to impose liability on the parent for the torts of the subsidiary. *Zaist v. Olson,* 154 Conn. 563, 227 A.2d 552 (1967); *McCarthy v. Ference,* 358 Pa. 485, 58 A.2d 49 (1948). *See also* 10 Fletcher Cyc.Corp. § 4878 (perm. ed. 1978).

The plaintiff's appeal is denied in part and sustained in part, so much of the judgment as relates to the grant of Giroux's motion for a directed verdict on the res ipsa count is vacated, and the case is remanded to the Superior Court for further proceedings.

SHEA, J., did not participate.

11. Just prior to trial, the trial justice severed Giroux's third-party claim against the bottle

*Appendix*

g. *Defendant's exclusive control.* The plaintiff may sustain this burden of proof with the aid of a second inference, based on a showing of some specific cause for the event which was within the defendant's responsibility, or a showing that the defendant is responsible for all reasonably probable causes to which the event can be attributed. Usually this is done by showing that a specific instrumentality which has caused the event, or all reasonably probable causes, were under the exclusive control of the defendant. Thus the responsibility of the defendant is proved by eliminating that of any other person.

It is not, however, necessary to the inference that the defendant have such exclusive control; and exclusive control is merely one way of proving his responsibility. He may be responsible, and the inference may be drawn against him, where he shares the control with another, as in the case of the fall of a party wall which each of two landowners is under a duty to inspect and maintain. He may be responsible where he is under a duty to the plaintiff which he cannot delegate to another, as in the case of a landlord who leases premises dangerous to persons on the public highway, which his tenant undertakes to maintain. He may be responsible where he is under a duty to control the conduct of a third person, as in the case of a host whose guests throw objects from his windows. It may be enough that the defendant was formerly in control, at the time of the probable negligence, as in the case of a beverage bottler whose product poisons the consumer, when there is sufficient evidence to eliminate the responsibility of intermediate dealers. Exclusive control is merely one fact which establishes the responsibility of the defendant; and if it can be established otherwise, exclusive control is not essential to a res ipsa loquitur case. The essential question becomes one of whether the probable cause is one which the defendant was under a duty to the plaintiff to anticipate or guard against.

manufacturer and its parent company.