MARY B. BURDICK *vs.* SOUTH COUNTY PUBLIC SERVICE CO.

JUNE 4, 1934.

PRESENT: Stearns, C. J., Rathbun, Sweeney, Murdock, and Hahn, JJ.

HAHN, J.    This is a statutory action for death by wrongful act brought, under Sec. 14, Chap. 333, G. L. 1923, by the widow of Alvah H. Burdick for herself and others to recover damages arising out of his death.   The trial resulted in a verdict for plaintiff for $7,583.   Defendant's motion for a new trial was denied and the case is here on defendant's exceptions as follows:   to rulings during the course of the trial, to the denial of its motion for a directed verdict, to portions of the charge to the jury and to the denial of its motion for a new trial.

The facts are substantially as follows:   On July 7, 1930, shortly after 6 o'clock p. m. as Mr. Burdick was sitting in his kitchen his attention was attracted by the unusually loud noise made by the starting up of an electric motor attached to the pump in his cellar, and he went downstairs. The evidence does not show whether his intention was to shut off the motor, to give the pump a start by hand—which was necessary when the belt driving the pump slipped—or to perform some other operation in connection therewith.   Soon after he had gone downstairs Mrs. Burdick, who was in the kitchen, heard a cry or moan.   She went down at once and found her husband collapsed against the pump, which was running and continued to run until stopped by defendant's linesman.   When she touched her husband she received an electric shock.   She called her neighbors who helped to carry him upstairs.   The physician who attended him found two burns, one on his chest and one on his left foot, and pronounced him dead from electrocution.   According to testimony by experts, sufficient electricity had passed through his body to cause his death.

Mr. Burdick's home is set back about forty feet from the curbing of Main street in the village of Carolina.   Along the east side of this street, in line with a row of trees, the defendant maintained poles supporting cross-arms one above the other in the usual manner.   The upper arm carried three high-tension wires of 4,400 volts and two arc-light wires, and the lower arm carried additional arc-

light wires and three secondary wires of 110 volts each which supplied power and light for domestic use in the houses along the street. From these wires ran off-shoots or "leads" to each house using the service, including the Burdick home, where the wires connected to the house wiring.

On the day of the accident there had been a thunderstorm which ceased about 5 o'clock p. m. Plaintiff presented many witnesses whose homes are connected with defendant's wires and in most cases are protected with ground wires. These witnesses testified that during the hour from 5:30 to 6:30 electric fixtures in their homes emitted sparks or flames, and certain witnesses had received mild shocks, but there were no serious injuries sustained. The neighbors who had been summoned to the Burdick home testified that in front of that house one of the high-tension wires had broken and one end thereof had fallen across the wire leading from the 110-volt wire on the poles in to the house. Defendant's linesmen, who were at once called to repair wires in the vicinity and who repaired that particular wire, testified that one end thereof had fallen in running water in the gutter but that they did not see the wire touching any other wire.

There are two theories advanced to account for the electrocution of Mr. Burdick. Plaintiff contends that the excess electricity came in over the wire leading in to the house and thence into the electrical apparatus, including the motor and pump. Defendant contends that the excess passed down a tree, through the ground and into plaintiff's well, whence it was transmitted up a pipe leading into the pump. Each party introduced an expert who supported its theory with corroborating testimony. Plaintiff's expert, apparently a man of extensive electrical knowledge and experience, testified that he had examined the defendant's line in the vicinity of Carolina and the wires in and around the Burdick home. He stated that Mr. Burdick's motor and pump were standard equipment carrying a non-

dangerous voltage; that the insulation inside the house was proper but that there was no "grounding" just outside the house such as would prevent the introduction of excess electricity into the house and that this type of protective device is a proper and customary safeguard for an electrical system and is often installed or required by electric companies as a prerequisite to furnishing service to consumers. He further testified that in his opinion Mr. Burdick's death was caused by contact with an excess current coming through the wires leading from the pole in to the fixtures within the house. Defendant's expert, who was its chief electrician, offered testimony to support defendant's contention that the excess current was transmitted through the ground. Both experts agreed that the accident would have been prevented by an adequate grounding of the electrical system connected to the plaintiff's house.

Plaintiff urged the trial court to adopt the doctrine of *res ipsa loquitur*, citing *McCabe* v. *Narragansett Electric Co.*, 26 R. I. 427 and *Reynolds* v. *Narragansett Electric Co.*, 26 R. I. 457, and to charge the jury that the transmission of excess electricity from defendant's wires into plaintiff's house, which was fitted for a 110-volt current and was not properly equipped to receive any such high voltage as apparently entered it, presented a *prima facie* case and cast upon defendant the burden of refuting the same. As the declaration alleged specific acts of negligence on the part of the defendant, the trial court properly refused to adopt this request and required plaintiff to prove affirmatively the negligence of the defendant.

The defendant contends that its only responsibility was to maintain the electrical system on the poles along the street, which it had done by attaching new "safety grounds" thereto two years before the accident and by installing new insulators on the poles and trimming the trees thereabouts only two weeks prior to the accident. It claims that its equipment and liability ended where the service wires connected with the "lead wires" extending from the poles

to the houses and that the installing of a protective ground wire near the Burdick home was the duty of the Burdicks.

The case was submitted to the jury on three issues: whether the defendant was guilty of negligence which was the proximate cause of Mr. Burdick's death, whether Mr. Burdick was negligent and as to the amount of the damages. The jury by its verdict found that Mr. Burdick was not negligent and that defendant was guilty of negligence which was the proximate cause of the death.

Defendant urges an exception to a portion of the charge by the trial justice as follows: "Where death may be caused by an agency lawfully in use, such as we have here—electricity, ordinary care requires that every means known, or that with reasonable inquiry would be known, must be used to prevent it; the highest degree of care which skill and foresight can attain, consistent with the practical conduct of his business, in the known methods and the present state of the art." This was a correct statement of the law applicable to the instant case and the exception thereto must be overruled.

It is a well established principle of law that one using a dangerous instrumentality is bound to exercise care commensurate with the potential danger of such instrumentality. The duty of companies distributing electricity is therefore to use great care. *Moran* v. *Corliss Steam Engine Co.*, 21 R. I. 386; *Guinn* v. *Del. & Atl. Tel. Co.*, 72 N. J. L. 276. It has also been held that the patrons of such companies "have the right to presume that they will not be injured in attempting to use that which the company furnishes, and that it will do all that human care, vigilance and foresight can reasonably do consistent with the practical operation of its business to protect them from a dangerous electric current over its wires from any cause." 9 R. C. L. 1206; *Alabama City* v. *Appleton*, 171 Ala. 324; *Alexander* v. *Nanticoke Light Co.*, 209 Pa. St. 571; *Delahunt* v. *United T. & T. Co.*, 215 Pa. St. 241.

In the instant case the company chose to run wires bearing a number of different voltages through a line of trees. Electric companies are under duty to use all reasonable safeguards to prevent contact between parallel or intersecting wires. *Delahunt* v. *United T. & T. Co., supra; McKay & Roche* v. *So. Bell Tel. Co.*, 111 Ala. 337. As a practical proposition there would be much greater danger of such contact when wires are strung close to each other and so near to trees that during a storm branches may fall upon the wires and form a connection or short-circuit between them, causing the wires to burn through and fall, thus creating an additional danger. In the case before us there is evidence that a branch did fall upon certain high tension wires and caused a short-circuit therein; that a wire burned through, broke and fell upon the secondary wire, transmitting through it into the plaintiff's house the high voltage which the electrical equipment therein was unfitted to safely receive. It was further shown that electrical storms were not unusual in the vicinity and that during such storms, although the equipment in houses protected by safety ground wires was sometimes slightly damaged, no serious injury was sustained by the inmates thereof.

The defendant, from reasonably frequent and careful inspections of wires in the neighborhood and from an examination of the reports of its repairmen, could and should have known of the dangerous conditions and the proper safeguards which would protect its customers against injury therefrom, whereas the average consumer has insufficient knowledge of electricity to recognize such dangerous conditions or defects in electrical equipment on his premises and to remedy the same. We think it is not unreasonable to hold the defendant, in the exercise of due care, to the duty of protecting those of its customers who are receiving electricity under the unusual conditions above set forth by, itself, installing safety ground wires, or some other device now recommended to prevent the escape of high electrical currents, on the property of such consumers

or by warning said consumers that this safeguard is advisable and making its installation a prerequisite to their receiving or continuing to receive service from the company.

In 9 R. C. L. at 1215 the general proposition is stated that "the duty of electric companies is not limited to keeping their own wires in a safe condition but extends to the exercise of due care and diligence for the prevention of the escape of the dangerous force in their service through any wires brought in contact with their own . . ." In *Tismer* v. *N. Y. Edison Co.*, 170 N. Y. App. Div. 647, the rule is specifically enunciated that: "it is the right and duty of an electric light company, before delivering electricity to a customer, to take reasonable precautions to be assured that the private equipment within the building to which the electricity is to be delivered is adequate and safe. Indeed, it would appear . . . that a gas or electric company might incur heavy responsibility if it failed to take steps to assure itself of the sufficiency and safety of the interior equipment to which it was about to deliver current."

The finding of the jury that plaintiff's intestate was not negligent and that defendant was negligent has the support of the trial justice and there is sufficient evidence to sustain such finding. Defendant's motion for a directed verdict was properly denied. The contention that the verdict was against the law and the weight of the evidence is without merit. These exceptions are overruled.

Defendant relies on exceptions to certain rulings admitting evidence during the course of the trial and to portions of the charge to the jury. We have examined the rulings on evidence and find them to be correct, and the exceptions thereto are overruled. There was no error in the portions of the charge relating to defendant's duty to use due care, upon which defendant bases its seventeenth and eighteenth exceptions, and said exceptions are overruled.

There remains for our consideration the exception based upon the contention that the damages are excessive. It appears that there was some irregularity in the computation

of compensation for "odd jobs" performed by Mr. Burdick. A careful examination of the record in regard to the damages indicates that his earnings for playing in the band were erroneously included under this item and that the sum of $5 per week, the net amount received from the son for board, was not earned by the personal efforts of Mr. Burdick, and therefore—under the rule followed in *Underwood* v. *Old Colony Street Railway Co.*, 33 R. I. 319—was not a proper element of damage. Considering the case as a whole, and particularly the items above referred to, we are of the opinion on the record before us that the verdict should be reduced to $6,000.

The exception on the ground that the damages are excessive is sustained.

All the other exceptions are overruled and the case is remitted to the Superior Court for a new trial unless, on or before June 18, 1934, the plaintiff shall file in said court a remittitur of all said verdict in excess of $6,000. In case the plaintiff shall file such remittitur, the Superior Court is directed to enter judgment on the verdict as reduced by the remittitur.

*John P. Beagan, John J. Richards*, for plaintiff.
*Sherwood & Clifford, Sidney Clifford*, for defendant.