404 A.2d 836.

WALTER L. CARNEVALE *d.b.a.* COTE'S PHARMACY *vs.*
HARVEY N. SMITH *et al.*.

AUGUST 15, 1979.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

KELLEHER, J. The plaintiff, Walter L. Carnevale (Carnevale), owns and operates Cote's Pharmacy, situated in Newport at 104 Broadway. The defendants, Harvey N. and Carol J. Smith (the Smiths), are the owners of property that immediately adjoins the pharmacy. The Smiths' property is located at 96-100 Broadway and is separated from the pharmacy by a firewall.

On December 24, 1969, the Newport Fire Department was summoned to a conflagration that totally destroyed the Smiths' property. The pharmacy's stock and fixtures suffered smoke and water damage. The pharmacy was out of business for a period of almost a week, and Carnevale attributes his loss to the negligence of the Smiths and their fuel-oil dealer, Peckham Coal & Oil Company (Peckham). He sued both, and a Superior Court jury returned a $16,597 verdict for Carnevale against each defendant. The Smiths and Peckham appealed, claiming that the trial justice erred in denying their motions for directed verdicts as well as in his charge to the jury.

The decisive issue in this appeal is the denial of the motions for directed verdicts. In considering the denials, we are bound to view the evidence in the light most favorable to Carnevale, extracting from the record only those reasonable inferences that support his claim; we are not concerned with the weight of the evidence or the credibility of witnesses. *Nagy* v. *McBurney*, 120 R.I. 925, 928, 392 A.2d 365, 367 (1978); *Evans* v. *Liguori*, 118 R.I. 389, 394, 374, A.2d 774, 776 (1977).

The record in this case, when viewed in the light most favorable to Carnevale, reveals that the Smiths purchased this building in March 1969. Sometime in the early summer of 1969, Harvey N. Smith (Smith) contacted Peckham and arranged for the dealer to deliver heating oil to 96-100 Broadway. The ground-floor portion of the premises was rented to two tenants, Ben's Chili Dog (Ben's) and Moss Music (Moss). The premises' upper two floors were to be used as a roominghouse containing approximately 15 living units. Smith testified that he believed the heating system that serviced Ben's had been used regularly up until and after the time that he purchased the building, but that the system that heated the roominghouse area had been in disuse for approximately 5 years. Moss had no central-heating system, apparently placing its faith in the heat-generating qualities of a gas-fed hot-water heater that was located in the cellar. Smith testified that, in light of the lack of use of the roominghouse heating units, he had asked Peckham to inspect and update the system and make it operative. Smith, who professed to know nothing whatever about heating systems, also said that at no time prior to the fire did he himself attempt to inspect any component of the heating systems.

There was considerable disagreement between Smith and Peckham concerning the responsibilities that Peckham had assumed relative to the heating systems. Peckham, as part of its business, sold oil tanks and, although its manager admitted receiving instructions from Smith "to go ahead with whatever [Peckham] thought was necessary," the manager insisted that the service to be provided by Peckham was limited to oil delivery and an "annual checkup" of the boiler and burner. In other words, it did not include an inspection of any of the three oil tanks in the cellar. In fact, the manager told the jury that once Peckham had updated the boiler, any further repairs to the system would be more properly the concern of the Smiths and their plumber. Nonetheless, a repair invoice sent to Smith reveals that in September 1969 two of Peckham's workers spent a total of 14½ hours "updating" the system, at a cost to Smith of slightly more than $180, and that

in the process they used 30 feet of ¼-inch copper tubing. Because there was testimony that no actual repairs were made to Ben's system, it follows that the copper tubing was used in the servicing of the system that heated the rooming-house area. Further, because the manager admitted that the copper tubing most probably had been used to run between a boiler and a tank, it is reasonable to conclude that Peckham's employees did in fact work on at least one of the two oil tanks that were part of the roominghouse-area system.

On November 25, 1969, approximately a month before the December fire, a Peckham employee delivered oil to the tank that serviced Ben's; the delivery was made as part of Peckham's automatic delivery service. Unfortunately, however, a combination of mild weather and the heat generated from cooking appliances had caused Ben's to use little oil since Peckham's delivery of the month before. The record clearly supports Carnevale's theory that on November 25, Peckham poured a substantial quantity of oil into a tank that was already virtually full. Carnevale contends that, as the result of both the deteriorated condition of the tank and the pressure created by the unneeded oil, a seam in the tank ruptured, spilling enough oil to cover the cellar's dirt floor with approximately 2 inches of the substance. About a week after the rupture, Newport's fire marshal gave the Smiths permission to relight the oil systems and the gas hot-water heater. This approval followed the marshal's personal inspection of the premises to insure that the cleanup operation had been adequately performed by the private contractor hired by Smith for that purpose. According to Peckham's manager, his employer's role in the cleanup was strictly limited to covering the cellar floor with a sawdust compound, the purpose of which was, of course, to soak up the spilled oil; Peckham provided both the labor and the supplies free of charge.

The testimony concerning what happened after the oil spill is confused. At a minimum, it appears that Smith and Peckham's manager had a telephone conversation very shortly after the rupture and discussed, in Smith's words, the

"possibility that since one tank had ruptured that the other tanks within the building [that is, those that serviced approximately a dozen individuals who were then in residence] should be looked at, checked over, and if necessary replaced." Further, Smith testified to having told the manager that he "wanted [Peckham] to do what had to be done to insure that such an incident would not occur again * * *." In this connection Smith questioned the manager about the possibility of replacing the two tanks that serviced the roominghouse area with one large outdoor tank; Smith was soon thereafter informed that installation of such a tank would be a physical impossibility. As far as the record indicates, the two men did not communicate further concerning the two tanks that had not ruptured. Although the fire marshal testified that he gave his permission to relight the systems on the supposition that only two tanks would be in use, the record establishes that, although there were no further deliveries of oil to the still-ruptured tank, it was never replaced. Rather, Ben's was apparently to consume the oil that remained—approximately half of the contents—and that thereafter Peckham would replace the tank, at Smith's expense. Peckham's manager testified that, to his knowledge, there was nothing necessarily improper in allowing Ben's to consume the remaining oil.

On December 24, 1969, shortly before 10 a.m., an employee of Peckham delivered oil to the two tanks that serviced the roominghouse area, that is, to the tanks that had not ruptured. Each tank had a filler pipe that protruded through the foundation and out into a back alley. The employee testified that each tank had a vent whistle, serving to inform him when the tank was full, and that in order to hear one of the whistles, he had to open the cellar door. He opened the door after obtaining a key from Gerald Bienvenue (Bienvenue), co-owner of Ben's, but there is no evidence that the employee ever actually entered the cellar. Evidence in the record does state that for each fill the delivery person heard a whistle. When the whistling had stopped, the tanks were full, and the oil truck proceeded on its way. Within

minutes of the delivery's completion, witnesses heard a sound described by one as a "sudden explosion," followed shortly by what Carnevale termed a raging fire. Newport Fire Department Captain John Oakley and Fire Marshal Herbert F. Nolan each testified that he arrived on the scene approximately 15 minutes after the fire alarm that had been sounded at 10:18 a.m.; at that time each observed a massive amount of black smoke, which the fire marshal testified indicated an oil fire. Approximately a month after the fire, investigators discovered a hole in the base of one of the two roominghouse tanks that until then had remained undisturbed amidst the debris of the partly razed building.

Once Peckham and the Smiths made it known that they were not presenting any evidence, the trial justice permitted Carnevale to amend his complaint in order to include a count involving the doctrine of res ipsa loquitur. The remaining counts alleged specific acts of negligence on the part of Peckham and the Smiths, in general charging the Smiths with storing fuel oil in tanks which they knew, or should have known, were "deteriorated, weakened, unsafe and dangerous"; that Peckham should have inspected the tanks before making its December 24 delivery; and that Peckham failed to upgrade the heating systems properly.

For reasons that follow, we believe that the trial justice erred in denying the motions for directed verdicts. In *Wilkinson* v. *Vesey,* 110 R.I. 606, 631, 295 A.2d 676, 691 (1972), we described as follows the circumstances under which the doctrine of res ipsa loquitur may be invoked by a plaintiff as an aid in proving circumstantially that he was injured by the negligence of a certain defendant or defendants: (1) the event must be of a kind that ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary act or contribution on the part of the plaintiff. A plaintiff able to rely upon res ipsa loquitur need neither allege nor prove those *specific* acts of negligence that proximately caused his injury; indeed, reliance upon the

doctrine is proper only where the evidence has failed to disclose the specific negligence but where the mishap would not have occurred if those who had management of its cause had used proper care. *Turner* v. *Wallace,* 71 Ill. App. 2d 160, 166-67, 217 N.E.2d 11, 14 (1966). For that reason the application of the res ipsa loquitur doctrine furnishes evidence that, in the absence of some explanation by the defendant, the accident occurred as a result of negligence. *Wilkinson* v. *Vesey,* 110 R.I. at 632-33, 295 A.2d at 692; *Cinq-Mars* v. *Kelley,* 95 R.I. 515, 522, 188 A.2d 379, 383 (1963).

On appeal the Smiths and Peckham contend that there was no evidence which would support the application of the doctrine of res ipsa loquitur and that, therefore, their motions for directed verdicts should have been granted. First, they argue that there was no evidence before the jury tending to prove that the fire-explosion episode was such as would not have occurred absent negligence; second, they contend that, in any event, there was insufficient evidence to support a finding that either or both defendants exercised the type of control over the accident-causing instrumentality that is required for invocation of the doctrine. Because of our resolution of the issue raised by defendants' first argument, we need not discuss separately and at length the issue of control.

The settled rule in this jurisdiction is that the mere occurrence of an accident, without more, does not warrant an inference that a defendant was negligent or that its negligence was the proximate cause of the plaintiffs' injury. *Montuori* v. *Narragansett Electric Co.,* No. 77-286-A. (R.I., filed June 11, 1979);*Salk* v. *Alpine Ski Shop, Inc.,* 115 R.I. 309, 312, 342 A.2d 622, 625 (1975). Despite the evidentiary boost given a plaintiff allowed to rely upon res ipsa loquitur, the plaintiff must, of course, carry its burden of proof. As Prosser explains, "[t]he inference must cover all of the necessary elements of negligence, and must point to a breach of the defendant's duty." Prosser, *Torts* §39 at 212 (4th ed. 1971). Where, however, the evidence does not disclose a

sufficient balance of probabilities in favor of negligence, the doctrine is inapplicable, and the trial justice should direct the jury that the plaintiff has failed to carry its burden of proof. *Id.* at 211-12, 218. *See Russo* v. *G.W. Gooden, Inc.,* 108 R.I. 356, 359, 275 A.2d 266, 268 (1971).

In most res ipsa loquitur cases, an inference of negligence arises from an ascertainable injury-producing event—that is, the cause of the plaintiff's injury is typically known, leaving only the question whether an inference can be drawn from the occurrence and its surrounding circumstances. Here, however, in order to sustain Carnevale's claim, the jury must be able to infer *both* the cause of the explosion and fire and defendants' negligence relative to that cause. *Russo* v. *G.W. Gooden, Inc.,* 108 R.I. at 360, 275 A.2d at 269. *See Rollins* v. *Avey,* 296 A.2d 214, 216, (Ky. Ct. App. 1956); *Manley* v. *New York Telephone Co.,* 303 N.Y. 18, 25-26, 100 N.E.2d 113, 116 (1951). Carnevale correctly observes that the factfinder is permitted to base an inference on another that it has already drawn. *Waldman* v. *Shipyard Marina, Inc.,* 102 R.I. 366, 373, 230 A.2d 841, 845 (1967). However, our case law makes clear that if a plaintiff intends to meet its burden of proof by means of such pyramiding, the second or ultimate inference drawn by the factfinder is permissible only if the first or prior inference has been established to the exclusion of other reasonable inferences. *Waldman* v. *Shipyard Marina, Inc.,* 102 R.I. at 373, 230 A.2d at 845. *See also Conlin* v. *Greyhound Lines, Inc.,* 1120 R.I. 1, 5, 384 A.2d 1057, 1059 (1978). In this way the ultimate inference rests upon a foundation that logically has the probative force of established fact; were it otherwise, the ultimate conclusion—here, that the circumstances surrounding the accident indicate negligence—would rest on no more than conjecture and surmise. *Russo* v. *G.W. Gooden, Inc.,* 108 R.I. at 360, 275 A.2d at 269; *Waldman* v. *Shipyard Marina, Inc.,* 102 R.I. at 373, 230 A.2d at 845. We hold the opinion that the evidence presented to the jury in this case was insufficient, when measured against the standard of *Waldman,* to allow an inference that the cause of the

explosion and fire was as Carnevale theorized—a rupture and ensuing spillage, both of which occurred immediately after the tank had been filled on December 24, 1969.

We note at the outset that Carnevale introduced no expert testimony to help the jury identify the likely source of the ignition that would cause the explosion and fire or to support his claim that the roominghouse tanks were dangerously deteriorated and unsafe. Without question, ample evidence exists that oil was involved in the fire at least *after* its outbreak. The fire marshal, for example, testified that, in his opinion, an oil fire was definitely in progress when he arrived at the scene, which arrival, again, was at approximately 10:30 a.m. Also, Bienvenue testified that some "several minutes" after having given a key to the cellar to Peckham's delivery person, he heard an explosion, and that thereafter soot and black smoke escaped from the basement. However, this evidence alone furnishes no basis for inferring that one of the two roominghouse tanks ruptured *before* the fire and that a resulting spill somehow caused the explosion and fire. In addition, although one of the two tanks that serviced the roominghouse was in fact found to have a hole in it, no evidence came to light to relate that condition to a time prior to the outbreak of fire; in fact, the defect was discovered not only more than 1 month after the fire, but also only after the tank had been taken out from under the entire contents of the first floor, which at the height of the fire had collapsed into the cellar. Finally, even assuming for the moment that a tank did in fact rupture before the fire, the record is noticeably devoid of any evidence, expert or otherwise, to suggest *how* the spilled oil might have in turn triggered an explosion. *See Tedrow* v. *Des Moines Housing Corp.*, 249 Iowa 766, 771-72, 87 N.W.2d 463, 467 (1958); *Kansas City Fire & Marine Insurance Co.* v. *Bituminous Casualty Corp.*, 209 So. 2d 785, 788-89 (La. App. 1968).

Under such circumstances, it is apparent that Carnevale has failed to prove with any degree of certainty that either of the two roominghouse tanks was the instrumentality causing the explosion and fire, and that, therefore, any inference of

negligence based upon that theory rests upon conjecture alone. *Rollins* v. *Avey,* 296, S.W.2d at 216. *See Salk* v. *Alpine Ski Shop,* 115 R.I. at 313, 342 A.2d at 625; *Russo* v. *G.W. Gooden, Inc.,* 108 R.I. at 360, 275 A.2d at 269. Because there is insufficient evidence indicating what caused the explosion and fire, there is simply no basis upon which to conclude that either or both defendants could have prevented it by the exercise of due care.

For these reasons, this evidentiary gap is also fatal to Carnevale's allegations of specific negligence. The defendants' motions for directed verdicts should have been granted.

The defendant's appeals are sustained, the judgments appealed from are vacated, and the case is remanded to the Superior Court with direction to enter judgments for the defendents.

*Ward & Cresto, Dominic F. Cresto, Strauss; Factor, Chernick & Hillman Professional Corporation, Abraham Factor, John L. Breguet,* for plaintiff.

Rice, Dolan, Kiernan & Kershaw, John W. Kershaw (for Harvey N. Smith and Carol J. Smith); *Higgins, Cavanagh & Cooney, Joseph V. Cavanagh* (for Peckham Coal & Oil Company), for defendants.