**Anthony MONTUORI d/b/a
Montuori's Auto Service**

v.

**NARRAGANSETT ELECTRIC CO.**

**No. 77–286–Appeal.**

Supreme Court of Rhode Island.

Aug. 5, 1980.

---

6 ■■

See also, 402 A.2d 583.

Gerard McG. DeCelles, Thomas Carlisle Angell, Providence, for plaintiff.

Roberts, Carroll, Feldstein & Tucker, David W. Carroll, R. Kelly Sheridan, Providence, for defendant.

## OPINION

BEVILACQUA, Chief Justice.

The plaintiff, Anthony Montuori, instituted this civil action to recover for property damage on his business premises. The damage resulted from a fire allegedly caused by the negligent maintenance of the electric power lines of the defendant, Narragansett Electric Company, a Rhode Island public utility corporation engaged in the distribution of electric power. The case was tried before a jury in the Superior Court. At the close of plaintiff's case, the defendant made a motion for a directed verdict, which the trial justice denied. At the close of its own case, the defendant renewed its motion for a directed verdict. The trial justice reserved decision on the motion and submitted the case to the jury. The jury returned a verdict in favor of the plaintiff in the amount of $10,580, after which the trial justice denied the defendant's motion for a directed verdict. The defendant now appeals from the judgment entered on the verdict.

On February 9, 1979, we heard oral arguments on the sole issue of whether the trial justice properly denied defendant's motion for a directed verdict. Believing, however, that the case raised other issues that were neither briefed nor argued, we did not issue a full opinion, rather, we directed the parties to brief and argue two additional issues: (1) whether the so-called "doctrine of exclusive control" has been or should be incorporated into the doctrine of *res ipsa loquitur* and (2) whether the plaintiff in this case could benefit from either theory. *Montuori v. Narragansett Elec. Co.*, R.I., 402 A.2d 583, 585 (1979). The parties filed supplementary briefs, and we heard oral arguments on the issues on February 4, 1980. We now hold that the trial justice should have granted defendant's motion for

a directed verdict. We also hold that the "doctrine of exclusive control" shall be incorporated into the doctrine of *res ipsa loquitur*, but that on this record, including the pleadings, plaintiff is not entitled to benefit from the latter doctrine.

I

In our earlier opinion, we stated that the questions presented by the trial court's denial of the motion for a directed verdict were: (1) what a plaintiff must establish to escape a directed verdict and (2) whether the expert testimony relied upon by plaintiff spoke in terms of "probability" rather than "possibility" and thus overcame the limitations imposed by *Evans v. Liguori*, 118 R.I. 389, 398, 374 A.2d 774, 778 (1977), and *Sweet v. Hemingway Transport, Inc.*, 114 R.I. 348, 355, 333 A.2d 411, 415 (1975). *Montuori v. Narragansett Elec. Co.*, R.I., 402 A.2d at 584.

The plaintiff, Anthony Montuori, testified that at about midnight on the evening of October 10, 1972, the Providence police department informed him by telephone of a fire at his garage on Detroit Avenue in Providence. He stated that he had left the garage at about 11 p. m.; presumably, therefore, when the fire started, the garage was unoccupied. Montuori also testified that because a smoldering fire had destroyed the interior of his garage in July 1972, he had hired an electrician to rewire the entire electrical system to give it the capacity to handle 100 amperes of current, rather than 60 amperes. The electrician had installed a new service panel inside the garage, a new meter and meter trough on the outside wall, and a new conduit and wiring that ran from a weatherhead on the roof of the garage down to the meter. Raymond Rosa, a city electrical inspector, testified that on August 17, 1972, he had inspected plaintiff's newly wired electrical system and had approved it as meeting the required standards.[1]

Colonel Walter A. McQueeney, who in 1972 was Chief of the Providence police department, testified that at about 11:45 p. m. on October 10, 1972, as he was cruising in the vicinity of plaintiff's garage, he observed a small flame on the service wire leading from one of defendant's service poles to what he surmised was plaintiff's garage. Colonel McQueeney testified that at that time he detected no evidence of a fire within the garage itself. He then reported the existence of the flame to headquarters and proceeded to a nearby restaurant. He testified that after having left the restaurant a short time later, he passed by plaintiff's garage, which he described as an "inferno." He also observed that the entire service wire was then afire.

The plaintiff's expert witness, John W. King, an electrical engineer, testified that he had gone to plaintiff's garage on the day after the fire and had made only a visual inspection of the interior equipment, the service panel, the outside meter, and the damaged, insulated conductors leading from defendant's service pole. He stated that as a result of his inspection he could find nothing directly wrong with the interior equipment. His opinion of the cause of the fire was "[t]hat the conductor out on the crossarm, for some reason, I don't know why—have never seen it before—became [*sic*] in proximity with each other, so they were able to come in physical contact, copper to copper." King theorized that the alleged contact had created a surge of electricity from the transformer and that although the pole serviced two other buildings, the overload went to ground through the garage wiring to plaintiff's service panel. An electrical surge seeks the easiest way to ground, and King surmised that because the new wiring and equipment in plaintiff's garage was "probably more healthy to serve as a ground than the next door neighbor's house," the surge had followed that path rather than any other.

---

1. The plaintiff's electrician, after finishing the job, had notified the city electrical inspector. The inspector, after determining that the job complied with the standards of the National Electric Code and the City of Providence Code, wrote up his report and sent a notice of the inspection to defendant, Narragansett Electric Company. The defendant sent a crew to the garage to examine the job and to make permanent taps on the meter.

On cross-examination, King admitted that he could not pinpoint the origin of the electrical fault with precision and that he had never before seen an instance in which two bare conductors in close proximity on a pole had caused a problem. He stated that he knew of instances in which a sudden voltage peak, such as lightning, had occasioned such a result and that a voltage peak might possibly have caused the electrical surge here. He also conceded on cross-examination that in November 1972, he had prepared a written report in which he postulated that a short circuit caused by contact between one live conductor and the neutral conductor "could occur within the service panel since all the conductors are in close proximity to each other."

On redirect examination, the plaintiff's attorney sought to have King restate his opinion of the fire's origin, despite the suggestion of alternative causes:

"Q And you are still saying it was outside the building—the cause was outside the building?

"A It is more likely to have been caused on the outside of the building than on the inside."

The defendant's sole witness, Bertrand Choiniere, an employee of defendant, who had taken photographs at plaintiff's garage on the morning after the fire, offered no opinion of the cause of the fire[2] but did attempt to explain the cause of the flame observed on the wire by Colonel McQueeney. Choiniere stated that defendant's service wires are of a gauge narrower than the gauge of the wires leading from the weatherhead to the service panel; therefore, after an electrical fault has occurred, whether negligently caused or not, the narrower wires heat up more rapidly as the power overload surges through from the transformer to ground.

In ruling on a motion for a directed verdict, a trial justice must view all of the evidence in the light most favorable to the nonmoving party and must give that party the benefit of all reasonable and legitimate inferences that may properly be drawn from the evidence, without weighing the evidence or exercising his independent judgment in regard to the credibility of the witnesses who have testified. *Conlin v. Greyhound Lines, Inc.*, R.I., 384 A.2d 1057, 1061 (1978); *Evans v. Liguori*, 118 R.I. at 394, 374 A.2d at 776; *Plouffe v. Goodyear Tire & Rubber Co.*, 118 R.I. 288, 294–95, 373 A.2d 492, 495–96 (1977); *Hamrick v. Yellow Cab Company of Providence*, 111 R.I. 515, 522, 304 A.2d 666, 671 (1973). In reviewing the decision of a trial justice on a motion for a directed verdict, this court is bound by the same standard. *Scittarelli v. Providence Gas Co.*, 415 A.2d 1048 (R.I.1980); *Plouffe v. Goodyear Tire & Rubber Co.*, 118 R.I. at 295, 373 A.2d at 496. If the trial justice finds that issues exist upon which reasonable men might draw conflicting conclusions, he shall deny the motion for a directed verdict and allow the jury to resolve controverted issues. *Evans v. Liguori*, 118 R.I. at 394, 374 A.2d at 776; *Hamrick v. Yellow Cab Company of Providence*, 111 R.I. at 522, 304 A.2d at 671.

We have often restated the proposition that a reasonable and legitimate inference that someone was negligent is not necessarily warranted by the mere happening of an accident. *Salk v. Alpine Ski Shop, Inc.*, 115 R.I. 309, 312, 342 A.2d 622, 625 (1975); *Goyette v. Sousa*, 90 R.I. 8, 15–16, 153 A.2d 509, 513 (1959); *Coia v. Eastern Concrete Products Co.*, 85 R.I. 128, 131–32, 127 A.2d 858, 860 (1956). Rather, to ensure that a trial justice or a jury will tend to draw only inferences that are reasonable and legitimate and will avoid conjecture, speculation, or surmise, a plaintiff must introduce a sufficiency of competent evidence to establish the essential elements of a prima facie case in negligence. *See Salk v. Alpine Ski Shop, Inc.*, 115 R.I. at 312, 342 A.2d at 625. The evidence must establish that the defendant owed a duty of care to the plaintiff and that the defendant breached his duty. *See Marshall v. Tomaselli*, 118

---

**2.** He did, however, offer the opinion that the short circuit occurred in plaintiff's service panel. This opinion focused on the location of the electrical fault rather than on a specific cause.

R.I. 190, 196, 372 A.2d 1280, 1283 (1977), and that the defendant's negligence was the proximate cause of the plaintiff's injury. See *Salk v. Alpine Ski Shop, Inc.*, 115 R.I. at 312, 342 A.2d at 625.

In *Burdick v. South County Public Service Co.*, 54 R.I. 310, 172 A. 893 (1934), this court stated that, "the duty of electric companies is not limited to keeping their own wires in a safe condition but extends to the exercise of due care and diligence for the prevention of the escape of the dangerous force in their service through any wires brought in contact with their own." *Id.* at 316, 172 A. at 896 (quoting 9 R.C.L. § 23 at 1215 (1915)). The *Burdick* court also approved the view that an electric company has a duty, "before delivering electricity to a customer, to take reasonable precautions to be assured that the private equipment within the building to which the electricity is to be delivered is adequate and safe." *Id.* at 316, 172 A. at 896 (quoting *Tismer v. N. Y. Edison Co.*, 170 App.Div. 647, 650–51, 156 N.Y.S. 28 (1915)).[3]

From this record, we find little or no direct evidence that defendant negligently breached its duty of care. The plaintiff elicited testimony that defendant had a pole inspection system requiring replacement of old poles and equipment, when defendant determines that they have reached an unsafe condition. The plaintiff also produced evidence to show that in May 1972, defendant had replaced the service pole and equipment next to the pole that had serviced plaintiff's garage. We do not believe, however, that standing alone, this evidence demonstrates that defendant negligently failed to replace the pole and equipment servicing the garage. Moreover, there is evidence to show that defendant in fact complied with its duty to inspect and approve the wiring newly installed after the July fire. The defendant received notice from the city electrical inspector and sent a crew to make the meter taps permanent.

The plaintiff attempted to establish defendant's negligence primarily by circumstantial evidence and by inferences that the touching of bare electrical wires caused the fire in the garage. The plaintiff was unable to produce more than minimal direct evidence to establish the element of causation. Colonel McQueeney's eyewitness testimony about the small flame on defendant's service wire and the testimony relating to the postfire condition of the service panel, the meter, and the insulation on the conductors were elicited to raise the inference that defendant was causally responsible for the fire. The testimony that plaintiff had installed new wiring after the July fire, that the wiring had been inspected and approved, and that plaintiff had no electrical problems since the installation tended to refute any inference that plaintiff was responsible for the cause.

The plaintiff called an expert to posit a theory of causation in order to assist the trier of fact in its resolution of the controverted issues. Before the trier of fact will be allowed to infer negligence with the assistance of an expert's opinion regarding causation, however, we require that opinion to be of substantial probative value. See *Evans v. Liguori*, 118 R.I. at 398, 374 A.2d at 778; *Salk v. Alpine Ski Shop, Inc.*, 115 R.I. at 313, 342 A.2d at 625; *Sweet v. Hemingway Transport, Inc.*, 114 R.I. at 355, 333 A.2d at 415. In *Sweet v. Hemingway Transport, Inc., supra*, we said:

"Expert testimony, if it is to have any evidentiary value, must state with some degree of positiveness that a given state of affairs is the result of a given cause. Absolute certainty, of course, is not required. In those cases where expert testimony is relied on to show that out of several potential causes a given result came from one specific cause the expert must report that the result in question 'most probably' came from the cause alleged." (emphasis in original) *Sweet v. Hemingway Transport, Inc.*, 114 R.I. at

---

3. As a corollary to the company's duty, the consumer has a "right to presume that [he] will not be injured in attempting to use that which the company furnishes * * *." *Burdick v.*

*South County Public Service Co.*, 54 R.I. 310, 314, 172 A. 893, 896 (1934) (quoting 9 R.C.L. § 16 at 1206 (1915)).

355, 333 A.2d at 415 (citing *Tabuteau v. London Guar. & Accident Co.*, 351 Pa. 183, 40 A.2d 396 (1945)).

The standard set out in *Sweet* is not always easy to apply. In some cases, differing interpretations of the probative value of the testimony may be reached when the expert does not speak in a consistent tone. Here, during his testimony the expert acknowledged no fewer than six times that he was in effect "speculating." On redirect examination, however, King stated that the fire was "more likely" to have been caused as he suggested, language closer to the *Sweet* standard. The defendant initially made a motion to strike King's testimony as "merely speculation, merely guesswork as to what occurred." The trial justice denied the motion, saying that "Mr. King was just being overly frank and truthful, and was being very cautious in the use of his words. * * * [W]hile in many instances he did say 'my best guess or speculation,' he did in effect say that was his opinion based on his knowledge, expertise." This court must look at the testimony in its entirety to determine whether the *Sweet* standard has been met. Having done so, we believe that King's opinion was not based on a sufficient quantum of other competent evidence in the record and that his opinion failed to rise above the level of mere conjecture and surmise.[4] Furthermore, King's testimony failed adequately to eliminate other plausible theories for the cause of the fire and in its totality failed to speak in terms of "probability." *See Evans v. Liguori*, 118 R.I. at 398, 374 A.2d at 778. Ultimately, the expert testimony failed to provide the jury with a sufficiently probative evidentiary basis upon which to determine the cause of the fire. Without that basis, the jury should not have been allowed to draw an inference of negligence. The trial justice should have granted defendant's motion for a directed verdict.

**4.** On our examination of the record before us, we believe that we can summarize King's expert testimony as follows: assuming that the insulation on the conductors had worn away to such an extent that bare metal could touch bare metal, the resulting physical contact could have caused an electrical surge to seek ground in plaintiff's garage and start a fire; a fire of

II

In *Montuori v. Narragansett Elec. Co.*, R.I., 402 A.2d 583 (1979), we directed the parties to brief two additional questions before we would dispose of this appeal: (1) whether the "doctrine of exclusive control" remains a separate doctrine or is merely the doctrine of *res ipsa loquitur* by another name and (2) whether plaintiff on the record in this case, including the pleadings, may benefit from either theory. *Montuori v. Narragansett Elec. Co.*, R.I., 402 A.2d at 585. In their briefs, and at oral argument, the parties agreed that the "doctrine of exclusive control" has been incorporated into the principle of *res ipsa loquitur*, but obviously we are not bound by any agreement between the parties. We therefore undertook an independent review of several Rhode Island cases that refer to either one doctrine or the other.

It was in 1891 that this court appears first to have recognized the principle of tort law that the happening of an accident, by itself, may amount to prima facie evidence of negligence, "where the cause or instrumentality of the accident is under the defendant's control, and where such an accident does not ordinarily occur if the proper precautions be taken * * *." *Cox v. Providence Gas Co.*, 17 R.I. 199, 200, 21 A. 344, 344–45 (1891); *see Parker v. Providence & Stonington Steamboat Co.*, 17 R.I. 376, 377, 22 A. 284, 284 (1891). Although avoiding any specific label, the court five years later at least implicitly referred to this principle as the doctrine of *res ipsa loquitur* in *Ellis v. Waldron*, 19 R.I. 369, 371, 33 A. 869, 870 (1896). In *Reynolds v. Narragansett Electric Lighting Co.*, 26 R.I. 457, 59 A. 393 (1904), this court may have intended to add the requirement that the responsible agency or instrumentality be "*wholly* under the control of [the defendant,]" *id.* at 458, 59 A. at 394 (emphasis

electrical origin occurred; therefore, defendant's wires came into physical contact. Although we would admit the existence of a minimal quantum of direct and circumstantial evidence in support of this reasoning, we still cannot avoid the view that this is a classic example of question-begging.

added), but we do not believe that in *Reynolds* this court established a separate doctrine called the "doctrine of exclusive control."[5]

Subsequent cases referred to the principle laid down in *Cox v. Providence Gas Co.*, and *Ellis v. Waldron*, both *supra*, expressly as the doctrine of *res ipsa loquitur. See, e. g., Motte v. First National Stores, Inc.*, 76 R.I. 349, 354–55, 70 A.2d 822, 825 (1950); *Kilgore v. The Shepard Co.*, 52 R.I. 151, 154, 158 A. 720, 721 (1932); *Kearner v. Charles S. Tanner Co.*, 31 R.I. 203, 214–15, 76 A. 833, 837 (1910); *LaForrest v. O'Driscoll*, 26 R.I. 547, 550, 59 A. 923, 925 (1905).

In 1950, this court made its first explicit reference to the "doctrine of exclusive control" in *Eaton Realty Co. v. Petroleum Heat & Power Co.*, 77 R.I. 345, 348, 75 A.2d 178, 180 (1950).[6] This court borrowed the phrase from a Pennsylvania case, *Commonwealth v. Montour Transport Co.*, 365 Pa. 72, 73 A.2d 659 (1950); .a careful reading of that case and prior Pennsylvania cases, however, indicates that in that state the courts had drawn a clear, albeit formalistic, distinction between the doctrine of *res ipsa loquitur* and the doctrine of "exclusive control," a distinction not previously recognized in Rhode Island.[7] The courts of this state for a time after *Eaton Realty, supra*, adopted

the label "the doctrine of exclusive control" for what had been previously labeled *res ipsa loquitur. See Cinq-Mars v. Kelley*, 95 R.I. 515, 519–20, 188 A.2d 379, 382 (1963); *Goyette v. Sousa*, 90 R.I. 8, 16, 153 A.2d 509, 513 (1959); *Coia v. Eastern Concrete Products Co.*, 85 R.I. 128, 132, 127 A.2d 858, 860 (1956). Even in these cases, however, which expressly referred to the "doctrine of exclusive control," there were implicit admissions, specifically in the cases cited, that the two doctrines were interchangeable. *See Cinq-Mars v. Kelley*, 95 R.I. at 519–20, 188 A.2d at 382; *Goyette v. Sousa*, 90 R.I. at 16, 153 A.2d at 513. More recently this court has eschewed any reference at all to the "doctrine of exclusive control" when considering situations in which the happening of an unusual event may constitute prima facie evidence of negligence. *See Carnevale v. Smith*, R.I., 404 A.2d 836, 840 (1979); *Marshall v. Tomaselli*, 118 R.I. at 197–98, 372 A.2d at 1284; *Wilkinson v. Vesey*, 110 R.I. 606, 631, 295 A.2d 676, 691 (1972); *Lopes v. Narragansett Electric Company*, 102 R.I. 128, 130–31, 229 A.2d 55, 57 (1967).

■ As a result of our examination of Rhode Island law on this particular question, we are thoroughly convinced that no rational distinction has ever existed between the doctrine of *res ipsa loquitur* and

---

5. The statement quoted from *Reynolds v. Narragansett Electric Lighting Co.*, 26 R.I. 457, 458, 59 A. 393, 394 (1904), that the apparatus was "wholly under the control of [the defendant]," appears to be a finding of fact rather than a statement of law. None of the previous cases had specifically required a plaintiff to establish a defendant's exclusive or total control over the apparatus. *See Ellis v. Waldron*, 19 R.I. 369, 33 A. 869 (1896); *Parker v. Providence & Stonington Steamboat Co.*, 17 R.I. 376, 22 A. 284 (1891); *Cox v. Providence Gas Co.*, 17 R.I. 199, 21 A. 344 (1891). The control that a plaintiff must show is now defined as "a sufficiently complete domination over the instrumentality as to exclude the probability that any agent other than the particular defendant could have caused the injury." *Goyette v. Sousa*, 90 R.I. 8, 16, 153 A.2d 509, 514 (1959).

6. In a sense, our conclusion here contradicts the language in the first opinion, *Montuori v. Narragansett Elec. Co.*, R.I., 402 A.2d 583, 585 (1979), that *Reynolds, supra*, is the leading case on the "sole control doctrine" in this jurisdic-

tion. *Reynolds, supra*, applied the doctrine of *res ipsa loquitur. See Motte v. First National Stores, Inc.*, 76 R.I. 349, 356, 70 A.2d 822, 825–26 (1950); *Burdick v. South County Public Service Co.*, 54 R.I. 310, 313, 172 A. 893 (1934).

7. Pennsylvania courts had limited "the use of the Latin phrase 'res ipsa loquitur' to those cases in which the defendant owed the plaintiff the 'highest degree of care.' Included in this class of defendants were owners and operators of common carriers, elevators, and escalators, as well as suppliers of electrical power." *Gilbert v. Korvette, Inc.*, 457 Pa. 602, 606–07, 327 A.2d 94, 97 (1974) (footnotes omitted). In cases not involving this limited class of defendants, Pennsylvania courts had allowed juries to infer negligence under the doctrine of "exclusive control." *Id.* at 607–08, 327 A.2d at 98. In *Gilbert*, the Supreme Court of Pennsylvania rejected the common-law doctrines and their formalistic distinctions in favor of the evidentiary rule formulated by the American Law Institute. *See* 2 Restatement (Second) of Torts, § 328 D at 156 (1965).

the so-called "doctrine of exclusive control." [8] Thus, we abolish the independent existence of the "doctrine of exclusive control," and we shall recognize only the doctrine of *res ipsa loquitur*.[9] We now need only decide whether the *res ipsa loquitur* doctrine is available to this plaintiff.

The defendant argues that plaintiff should not be entitled to the benefit of the doctrine of *res ipsa loquitur* because he did not plead it in his complaint. The doctrine, however, is not a rule of pleading, and a plaintiff need not specifically aver that he plans to rely on the doctrine in order to rely on it later. We do believe, however, that a complaint ought to set out basic facts that would support the application of the doctrine, for example, the defendant's control of the instrumentality responsible for the plaintiff's injury. On the record before us, we find that plaintiff's complaint adequately laid the foundation for later reliance on the doctrine.

More important to entitlement to the evidentiary boost afforded by the doctrine of *res ipsa loquitur* is that a plaintiff adduce competent evidence to satisfy the elements: (1) the event must be of a kind that does not ordinarily occur in the absence of someone's negligence; (2) the agency or instrumentality causing the event must have been within the exclusive control of the defendant; (3) the event must not have been due to any voluntary act or contribution on the part of the plaintiff. *Wilkinson v. Vesey*, 110 R.I. at 631, 295 A.2d at 691.

The plaintiff's expert failed to establish with the required degree of certitude the cause of the fire that gutted the interior of the plaintiff's garage. *See Sweet v. Hemingway Transport, Inc.*, 114 R.I. at 355, 333 A.2d at 415. Any inference of negligence, therefore, would have been based on speculation and conjecture. This evidentiary deficiency, which undermined the plaintiff's allegations of general negligence, also vitiates the plaintiff's chance to benefit from the doctrine of *res ipsa loquitur*. *See Carnevale v. Smith*, R.I., 404 A.2d at 841. The plaintiff's evidence did not adequately establish as a preliminary matter that the fire was of a kind that does not ordinarily occur in the absence of someone's negligence.

The defendant's appeal is sustained, the judgment appealed from is vacated, and the case is remanded to the Superior Court with direction to enter judgment for the defendant.

DORIS, J., did not participate.

---

**8.** In *Coia v. Eastern Concrete Products Co.*, 85 R.I. 128, 132, 127 A.2d 858, 861 (1956), the court stated that the theory of exclusive control was "clearly distinguishable" from the doctrine of *res ipsa loquitur*. The statement was unsupported, and in view of our holding today, we reject the conclusion embodied in that statement.

**9.** We agree in principle with the Supreme Court of Pennsylvania that calling *res ipsa lo-*

*quitur* a "doctrine" may not be appropriate. *Gilbert v. Korvette, Inc.*, 457 Pa. at 605 n. 7, 327 A.2d at 97 n. 7 (citing Prosser, *Law of Torts*, § 39 at 213 n. 72 (4th ed. 1971)). We further agree that "[r]es ipsa loquitur is neither a rule or procedure nor one of substantive tort law. It is only a shorthand expression for circumstantial proof of negligence—a rule of evidence." *Gilbert v. Korvette, Inc.*, 457 Pa. at 611, 327 A.2d at 99.