Michael PARRELLA, Donna Ann Parrella, and Michael Anthony Parrella

v.

Dr. Kathleen Cote BOWLING and Women & Infants Hospital of Rhode Island.

No. 2000–296–Appeal.

Supreme Court of Rhode Island.

May 16, 2002.

Thomas Dickinson, Jeffrey B. Pine, Providence, for Plaintiff.

Robert P. Dandau, David W. Carroll, Timothy P. Gallogly, Providence, for Defendant.

Present: WILLIAMS, C.J., BOURCIER, and GOLDBERG, JJ.

## OPINION

BOURCIER, Justice.

In this medical malpractice and negligence action, the plaintiffs, Michael Parrella and Donna Ann Parrella, individually and as parents of the plaintiff Michael Anthony Parrella, a minor, appeal from the entry of Superior Court final judgments in favor of the defendants, Dr. Kathleen Cote Bowling and Women & Infants Hospital of Rhode Island.

For the reasons hereinafter set out, we deny their appeals and affirm the final judgments entered by the Superior Court.

### Facts and Travel

In late April 1995, the plaintiff Donna Ann Parrella (Donna) was pregnant and under the medical care of the defendant, Dr. Kathleen Cote Bowling (Dr. Bowling), a medical doctor specializing in obstetrics and gynecology. At that time, Dr. Bowling had noted that Donna's pregnancy was nearing full term and that her in utero child, now the plaintiff, Michael Anthony Parrella (Michael Anthony), was relatively large, weighing almost nine pounds. Dr. Bowling was concerned that his shoulders might not be able to pass through Donna's pelvis.

After Donna made a prenatal visit to Dr. Bowling's office on May 17, 1995, one of Dr. Bowling's medical associates scheduled her for induction five days later.

On May 21, 1995, Donna, having "broken her water," was admitted to Women & Infants Hospital of Rhode Island (hospital or Women & Infants). She was administered prostin gel to soften her cervix, and labor was induced beginning at approximately 8:00 the next morning.

Donna's labor progressed throughout the day on May 22nd, and Michael Anthony's heart rate was monitored by an external device used to detect the fetal heart rate from outside the mother. The plaintiffs contended at trial that on May 22, 1995, at about 3:40 p.m., Donna was in the hospital labor room, where Dr. Bowling was attempting to turn Michael Anthony to ease his passage through Donna's birth canal. In so attempting the movement, Dr. Bowling's clothing became soiled when Donna suddenly urinated. Dr. Bowling then left the labor room to change her soiled clothing. An attending labor room nurse remained with Donna. Nine minutes later, at 3:49 p.m., the attending labor nurse, Cheryl Haynes, observed that Donna was becoming very uncomfortable and "talking nonsense." Nurse Haynes then notified the hospital's evening secretary to page Dr. Bowling. In the meantime, Nurse Haynes had observed questionable reports from the external monitoring device that Dr. Bowling had used to monitor Michael Anthony's fetal heart rate during labor. Nurse Haynes again requested the nurse's evening secretary to page Dr. Bowling at 3:53 p.m. to have Dr. Bowling place an internal monitor that would more accurately measure Michael Anthony's fe-

tal heart rate. There was no response from that page to Dr. Bowling. Nurse Haynes again at 3:57 p.m. and 4:02 p.m. attempted without success to have the evening secretary contact Dr. Bowling, who did however return to the labor room at 4:11 p.m. It later was discovered that the evening secretary had been paging Dr. Bowling on the wrong pager. Dr. Bowling on that day was carrying a pager other than her own because she had left her regular pager at home. Although Dr. Bowling had given her substitute pager number to the hospital's day secretary upon her arrival at the hospital, the substitute pager number was not conveyed to the evening shift secretary or hospital staff when the shift changed at 3 p.m.

When Dr. Bowling did return to the labor room and was made aware of what had occurred in her absence, she proceeded to apply an internal lead to more accurately measure the fetal heart rate and next proceeded to perform an emergency "crash cesarean" section on Donna at either 4:18 p.m. or 4:23 p.m. to deliver Michael Anthony.[1] Upon delivery, Michael Anthony was not breathing, had a low heart rate, and no reflexes, a condition determined to be hypoxic ischemic encephalopathy, brain damage resulting from a lack of oxygen. Michael Anthony later was diagnosed as suffering from cerebral palsy, a debilitating disease resulting from a lack of oxygen to his brain that had occurred at some point prior to his birth. All parties appear to agree that Michael Anthony's cerebral palsy condition has left him permanently and totally disabled, and that he remains at the level of an infant, unable to walk and speak and who must be fed through a tube inserted into his stomach. Because of his brain damage, he has little, if any, control of his legs and arm movements.

Michael Anthony's parents, for themselves and for Michael Anthony, filed suit on December 3, 1996, in the Providence County Superior Court, alleging that Dr. Bowling's delay in performing a cesarean section on Donna deprived Michael Anthony of vital oxygen and resulted in bringing about his cerebral palsy and brain damage. The plaintiffs also alleged that the hospital was negligent in its supervision of Donna and in its ability to have communicated with Dr. Bowling. Specifically, the plaintiffs asserted that the hospital's staff negligently failed to pass on Dr. Bowling's correct pager number from one work shift to the next, and that negligence contributed to bringing about Michael Anthony's cerebral palsy.

Following a jury trial that extended over a four-week period in early 2000, and which the trial justice later labeled a "credibility battle among the experts," the jury on March 6, 2000 found that the plaintiffs had failed to prove that Dr. Bowling had been negligent in her care and delivery of Michael Anthony and returned a verdict in favor of the doctor on the plaintiffs' medical malpractice claim.

On the plaintiffs' negligence claim against Women & Infants, the jury found that the hospital had indeed been negligent in not furnishing Dr. Bowling's pager number to the evening shift secretary, but found that such negligence was not a proximate cause of the onset of Michael Anthony's pre-birth cerebral palsy and returned

---

1. According to the clock in the delivery room, Michael Anthony was delivered at 4:23 p.m. Dr. Bowling testified that she adjusted the records to state that he was born at 4:18 p.m. because she said there was a five-minute discrepancy between the clock in the room where Donna had been laboring and the clock in the operating room where the cesarean was performed. After Michael Anthony's birth, Dr. Bowling changed the delivery time to 4:18 p.m. to correct what she believed to be an error.

a verdict in favor of Women & Infants Hospital.

After their motions for a new trial were denied, on April 7, 2000, the plaintiffs timely filed their appeal to this Court. In their appeal, they advance two issues. First, they assert that the trial justice erred in precluding their trial counsel from cross-examining one of the defendants' medical expert witnesses about an out-of-court medical opinion expressed by a medical doctor, who although available to be called as a witness was not called to testify. Secondly, they contend that the trial justice erred in failing to give their requested instructions in accordance with our holding in *Wilkinson v. Vesey*, 110 R.I. 606, 295 A.2d 676 (1972), and thereby confused the trial jury, leading to the return of what they allege are inconsistent jury verdicts.

## Analysis

■ At trial, the particular timing of the onset of Michael Anthony's debilitating cerebral palsy disease served as the undergirding for all the plaintiffs' claims. As correctly noted in their appellate brief, there appears to have been "no disagreement among the parties that Michael Anthony Parrella * * * suffers from cerebral palsy, a condition that resulted from the lack of oxygen to his brain that occurred some time prior to his delivery by emergency cesarean section." The trial jury was required to determine at what time that condition originated, and if any action, or lack of action, on the part of Dr. Bowling or the hospital precipitated its onset.

The plaintiffs' and the defendants' experts all appear to agree that Michael Anthony's cerebral palsy was the result of a "hypoxic event," meaning that at some time prior to his birth, the supply of oxygen to his brain was interrupted. The plaintiffs at trial attempted to prove that the "hypoxic event" occurred while Donna was in labor and under the control and care of Dr. Bowling. In attempting to satisfy that burden, the plaintiffs called Gerald I. Zatuchni, M.D., an Arizona physician, board certified in obstetrics and gynecology, who had practiced in his specialty for some thirty-five years. He testified that he had reviewed Donna's hospital records. From his review of those records he opined that the printouts from the external fetal heart monitor employed by Dr. Bowling during Donna's first hours of labor showed a decelerated fetal heart rate that should have concerned Dr. Bowling as early as 2:10 p.m., some two hours and eighteen minutes to two hours and twenty-three minutes before Michael Anthony was delivered. That "concern," opined Dr. Zatuchni, should have alerted Dr. Bowling to install an internal lead to more accurately measure the fetal heart rate, and she failed to do so even after further heart decelerations were noted at 2:20 p.m. and 2:40 p.m. He further opined that the 2:40 p.m. reading should have alerted Dr. Bowling that "something abnormal" was happening "with the oxygen getting to the baby's brain." He testified that a cesarean section should have been performed sometime between 3 p.m. and 3:30 p.m. It was his opinion after reviewing the fetal heart monitoring strips that Michael Anthony suffered from a lack of oxygen during the last forty-five minutes or so before birth, and had he been delivered just one hour earlier, the "last 45 minutes or so" of lack of oxygen would have been avoided.

However, during cross-examination, Dr. Zatuchni admitted that no one was capable of determining when a neurological injury occurs simply by reviewing fetal heart monitor strips. The following trial colloquy during his cross-examination demonstrates the efficacy of fetal heart monitor strips:

"Q As a matter of fact, Doctor, you are not capable—in looking at a fetal monitor strip, you're not capable of pinpointing when any neurological damage took place; isn't that correct?

"A Neither I nor anyone in the world.

"Q Now, so, as you go through that strip or as you went through that strip, you're not capable, and you say neither you nor anyone else would be capable, of interpreting that strip and saying this is where neurologic damage took place?

"A That is absolutely correct."

The next medical expert called by the plaintiffs, Leon Charash, M.D., whose dubious integrity and credibility were readily displayed to the jury through more than 200 pages of his deposition testimony shown on videotape, appears not to have been helpful to the plaintiffs in meeting their burden of proof.[2] Dr. Charash admitted during his deposition that he had submitted affidavits in the past swearing he was an obstetrician/gynecologist, anesthesiologist, neonatologist, and perinatologist, when in fact he is not certified in any of those specialty areas of practice. He also admitted to signing an affidavit stating that he had conducted multiple medical examinations of a child when he had in fact conducted only one examination.

The plaintiffs' expert witness, Dr. Charash, provided a striking contrast to those medical experts called by the defendants. First to testify for the defendants was Steven L. Clark, M.D., who is board certified in obstetrics and gynecology and maternal fetal medicine, a subspecialty of obstetrics dealing with high-risk pregnancies.

He testified that he is a professor of obstetrics and gynecology at the University of Utah School of Medicine and is the author of more than 160 publications. He is also an editor of a highly regarded treatise on obstetrics, *Williams Obstetrics*, and has lectured on obstetrics at universities both here and abroad.

Dr. Clark testified and opined that Michael Anthony suffered an insult many hours before birth. He based his opinion on three factors. First, shortly after birth Michael Anthony had a higher than normal amount of nucleated red blood cells, which he said occurs when the body senses low oxygen and produces such red cells. He testified that it takes the body at least twelve to twenty-four hours to sense low oxygen and make the cells, meaning Michael Anthony's injury could not have occurred in the hour before birth. Second, the oxygen level found on the umbilical cord pH after Michael Anthony's birth was in the normal range, indicating that he was receiving sufficient oxygen shortly before birth. Finally, Dr. Clark testified that Michael Anthony's creatinine level, which is a measure of kidney function, taken in the days immediately following birth, demonstrated that the hypoxic injury occurred a week or so before birth.

Paul Chervin, M.D., board certified in pediatrics and neurology with special competence in child neurology, also testified for the defendants. He is an instructor at Harvard Medical School with extensive experience in treating children with cerebral palsy. The trial justice described his credentials as "exemplary."

---

**2.** In 1995, Dr. Charash was deposed forty-five times and testified in court an additional forty to forty-five times, but he testified in early 1996 that he had only given fifteen or sixteen depositions the previous year. In December 1996, he testified that he had given ten or twelve depositions that year when he had actually already given thirty depositions. On August 25, 1997, Dr. Charash gave deposition testimony in three separate cases. By the time he was deposed in this case, Dr. Charash had testified by deposition or in court on at least 790 occasions.

Dr. Chervin testified that Michael Anthony did not suffer an insult shortly before birth. He testified that scalp samples taken at approximately 3 p.m. and 3:30 p.m. showed "oxygenation at the very high upper limit of normal." The oxygen level on the umbilical cord pH after birth also displayed more than adequate oxygenation levels. Dr. Chervin stated:

> "The oxygenation levels were perfect every time there were samples as Michael Parrella passed along the assembly line, so to speak, of going from being a fetus to an independent newborn. There is nothing to even suggest or intimate that there is ever asphyxia, hypoxia, ischemia or any process which was related to blood flow, the delivery of sugar or the delivery of oxygen to the baby's brain within the last few hours of intrauterine life."

Dr. Chervin also based his opinion upon the fact that approximately two-and-one-half hours after birth, Michael Anthony suffered a seizure, which was confirmed by an EEG, a test measuring brain waves. Dr. Chervin testified that such seizure activity does not occur until at least twelve to twenty-four hours after the insult, and perhaps as long as a week to ten days later.

William J. Cashore, M.D., a board certified neonatologist and pediatrician at Women & Infants, who served as a full professor at Brown Medical School since 1989 and who had authored about 150 medical publications and reviewed articles submitted to various medical publications, also testified as an expert witness for the defense. Like Dr. Clark and Dr. Chervin, Dr. Cashore testified that Michael Anthony's laboratory data demonstrated to him that Michael Anthony received adequate oxygen before birth. He noted that the diagnostic criteria for neurological impairment related to birth events requires four conditions to be met: (1) the scalp pH level shortly before birth shows lack of oxygen; (2) the Apgar scores of the child after birth should be three or lower for at least ten minutes; (3) the child must have multi-system organ failure; and (4) there must be an abnormal neurological examination after birth.

According to Dr. Cashore, Michael Anthony satisfied only the fourth criterion. He also noted that seizure activity generally occurs twelve to twenty-four hours after the insult, which would place the timing of the insult many hours before 3 p.m.

The defendants' expert witness testimony, we conclude, clearly demonstrates that the evidence at trial supporting the jury's finding of no negligence on the part of Dr. Bowling was overwhelming.

## I

### Cross–Examination of Defense Expert Witness

The plaintiffs' first claim of error concerns a question posed during cross-examination to Dr. Cashore, a defense expert witness, who had testified on direct examination that there was no injury to Michael Anthony in the one-and-one-half hours prior to his delivery. He explained that Michael Anthony's recorded oxygen levels during the second stage of labor and at birth were normal. Although he did believe that some type of hypoxic event occurred that disrupted the oxygen supply to Michael Anthony's brain, he said that such an event did not occur in the last ninety minutes before delivery and that there was no indication that Michael Anthony's oxygen level had decreased to an extent that brain injury could have occurred during labor. He also stated that the event causing Michael Anthony's brain damage could not be precisely determined.

Upon further direct examination, Dr. Cashore was questioned concerning a con-

versation he had with Dr. Gascon, a neurologist who also treated Michael Anthony after his delivery.[3] Neither party, it should be noted, elected to call Dr. Gascon to testify although Dr. Gascon was available to be called. Dr. Cashore was permitted to testify, after the plaintiffs withdrew their objection to his testifying, about an out-of-court conversation that he had engaged in with Dr. Gascon, and in which during this conversation, Dr. Gascon had said to him that the child's injury could have occurred "at any time."

On cross-examination, the plaintiffs' counsel attempted to impeach Dr. Cashore's version of what Dr. Gascon had told him with Dr. Cashore's pretrial deposition, in which he had said that Dr. Gascon told him that the child's injury could have occurred at any time in the later part of the pregnancy, particularly around the time of the beginning of labor through the time of delivery.

The full text of Dr. Cashore's deposition statement concerning this matter follows:

> "Dr. Gascon described for the family the nature of the baby's neurological difficulties in somewhat more detail than I was, and related the neurological problems to the findings on the MRI. I don't recall if anyone asked him directly when or how this happened. I do recall that he had some speculation that this could have occurred at just about any time in the later part of pregnancy, *particularly sometime around the time of onset of labor up to the time of delivery, that various scenarios were possible.* I'm

reconstructing that recollection, but I do believe that that was discussed in those terms." (Emphasis added.)

From the above statement, in light of a defense objection, the trial justice refused to allow the clause "particularly sometime around the time of onset of labor up to the time of delivery" to be read to the jury. The trial justice stated "because inadmissible evidence might have come in without objection during direct examination, equally inadmissible [evidence] can't come in during cross."[4]

The trial justice, we conclude, correctly determined that Dr. Cashore's complete deposition answer was inadmissible. Dr. Gascon's out-of-court statement was pure hearsay to which no exception applied. The plaintiffs erroneously suggest, however, that the statement should have been construed as non-hearsay because it was an adoptive admission of a party opponent, relying upon our opinion in *State v. Lerner*, 112 R.I. 62, 308 A.2d 324 (1973), a criminal case interpreting what constitutes an adoptive admission.[5] In *Lerner*, we held that in order to determine when silence constitutes an adoptive admission, a trial justice should consider whether the statement preceding a person's silence was incriminating or accusatory; whether it was a statement to which an innocent person in the defendant's situation would reply; whether it was made in the presence and hearing of the defendant; whether the defendant understood the statement's meaning; and whether the defendant had the opportunity to deny or reply to the

---

**3.** There is no transcript indication of the first name of Dr. Gascon. However, the American Medical Association web site lists a Dr. Generoso Gascon, a neurologist, who is licensed to practice in Rhode Island.

**4.** Plaintiffs' counsel initially objected to the question posed to Dr. Cashore on direct examination, but then withdrew the objection.

**5.** Rule 801(d)(2)(B) of the Rhode Island Rules of Evidence provides: "A statement is not hearsay if: * * * (2) * * * the statement is offered against a party and is (B) a statement of which the party has manifested his or her adoption or belief in its truth."

statement. *Id.* at 84, 308 A.2d at 338. Dr. Gascon, who was not an employee of the hospital, never made an accusatory or incriminating statement, but rather he simply speculated about a broad time range in which the brain damage to Michael Anthony might have occurred. There was no reason for Dr. Cashore to disagree with that speculative statement that was uncritical of the care rendered to Donna and Michael Anthony. Dr. Gascon's statement was not a statement offered against the hospital and was not critical of the hospital's reputation. Further, it did not contradict the testimony of the various defense expert witnesses, who all determined that Michael Anthony's brain damage occurred at least twelve to twenty-four hours before his birth. Additionally, Dr. Cashore had no reason to question Dr. Gascon's statement because he believed in the essential premise that the injury could have occurred at any time late in the pregnancy. The plaintiffs appear to have utterly failed to meet their burden under the *Lerner* test to show that the statement in question should have been construed as an adoptive admission of a party opponent.

The plaintiffs next contend that Dr. Gascon's out-of-court statement represented his expert medical opinion. However, Dr. Cashore testified that he recalled that Dr. Gascon "had some speculation" and that "various scenarios were possible" and points to the fact that Dr. Gascon did not hold to any definite opinion to a reasonable degree of medical certainty about the timing of Michael Anthony's injury to have been considered admissible as an expert opinion. The trial justice, we conclude, appropriately refused in light of Rule 702 of the Rhode Island Rules of Evidence [6] to admit this speculative opinion testimony, over the defendants' objection.

Given that none of the medical expert witnesses who testified at trial were able to pinpoint the precise time of Michael Anthony's in utero injury, it seems absurd to conjecture that had the jury been permitted to hear the entirety of Dr. Gascon's speculative out-of-court statement made to Dr. Cashore, it would have found a causal link between any negligence on the part of Dr. Bowling and the onset of Michael Anthony's injury.

We note also that the trial justice offered plaintiffs' counsel the option to strike the phrase "could have occurred at any time," but counsel refused to have it stricken. Plaintiffs' counsel also made no attempt to present Dr. Gascon, either in the plaintiffs' case-in-chief or as a rebuttal witness. The trial justice, after learning that Dr. Gascon was in Rhode Island and was available to testify, offered the plaintiffs the opportunity to bring him in as a rebuttal witness, but plaintiffs' counsel declined to do so.

The plaintiffs finally erroneously urge upon us that Rule 106 of the Rhode Island Rules of Evidence required the trial justice to permit the plaintiffs to introduce portions of Dr. Cashore's deposition testi-

---

**6.** Rule 702 of the Rhode Island Rules of Evidence provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion." The Advisory Committee's Note to Rule 702 states: "In evaluating the 'helpfulness' of the actual testimony, Rhode Island courts require an expert's opinion to be of 'substantial probative value.' *Montuori v. Narragansett Elec. Co.*, 418 A.2d 5 (R.I.1980). In *Montuori*, the [C]ourt held that this standard was less than certainty but more than mere probability. *Id.*, citing *Evans v. Liguori*, 118 R.I. 389, 398, 374 A.2d 774 (1977); *Salk v. Alpine Ski Shop, Inc.*, 115 R.I. 309, 313, 342 A.2d 622 (1975); and *Sweet v. Hemingway Transport, Inc.*, 114 R.I. 348, 355, 333 A.2d 411 (1975)."

mony concerning Dr. Gascon's speculative statement as to the onset of Michael Anthony's in utero injury. Rule 106 provides: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him or her at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." We need only point out that the defendants never introduced the deposition of Dr. Cashore into evidence. *See, e.g., State v. Gasparico,* 694 A.2d 1204, 1209–10 (R.I.1997).

## II

### Trial Justice's Instructions to the Jury

The plaintiffs next contend that the trial justice's instructions to the jury concerning Dr. Bowling's use of diagnostic tests were confusing and led to inconsistent verdicts. At trial the plaintiffs requested that the trial justice instruct the jury as follows:

"If a physician, as an aid to diagnosis, does not avail herself to [*sic*] all of the scientific means and facilities available to her so that she can obtain the best factual data upon which she can make a diagnosis, such an omission can be considered as evidence of negligence. *Sheeley v. Memorial Hospital,* 710 A.2d 161 (R.I.1998); *DiFranco v. Klein,* 657 A.2d 145 (R.I.1995); *Young v. Park,* 417 A.2d 889 (R.I.1980)."

The trial justice instead correctly decided that the plaintiffs' proposed instruction was not in accordance with Rhode Island law. In *Sheeley v. Memorial Hospital,* 710 A.2d 161, 167 (R.I.1998), we held that "a physician is under a duty to use the degree of care and skill that is expected of a reasonably competent practitioner in the same class to which he or she belongs, acting in the same or similar circumstances." In accordance with *Sheeley,*

which the plaintiffs erroneously cited as support for their proposed instruction, the trial justice properly instructed the jury that:

"[T]he test of a doctor's liability is not whether the doctor used all of the tests and devices available to her at the time, but whether by failing to use any device or test or by improperly using or applying such a device or test the doctor violated the legal standard of care as I have defined it for you."

The trial justice defined the standard of care as follows:

"A doctor is required to exercise the same degree of care and skill as that exercised by practitioners of ordinary competence engaged in the same practice at the time the doctor rendered the care involved in this action having due regard, of course, for the state of medical knowledge at the time the care was rendered."

The plaintiffs also fault the trial justice for using the word "judgment" in his instructions relating to the standard of care. Specifically, the trial justice stated:

"The law does not require of Dr. Bowling absolute accuracy either in her practice or in her judgment. It does not hold her to the standard of infallibility, nor does it require of her the utmost degree of skill and learning known only to a few in her profession, but only to that degree of knowledge and skill commonly possessed by members of her profession in her specialty similarly situated and in such a situation as that shown by the evidence."

The trial justice later stated:

"The test of the liability of a physician for malpractice is not whether the care and treatment of the patient was the doctor's best judgment or whether that judgment was mistaken. But, rather,

the test is whether that care and treatment met the legal standard of care as I have so defined it for you."

 The plaintiffs failed to object to this portion of the jury charge at trial, and thus that issue has been waived and is not now properly before us for review. Rule 51(b) of the Superior Court Rules of Civil Procedure provides: "No party may assign as error the giving or the failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the party's objection." This Court has stated that "[t]he rationale behind this rule is to allow the trial justice an opportunity to make any necessary corrections to his or her instructions before the jury begins its deliberations." *DiFranco v. Klein*, 657 A.2d 145, 147 (R.I.1995). Compliance with this rule is a "mandatory precondition" to preserving an objection to the jury instructions. *Id.* at 147. The plaintiffs' sole objection, we note, was to the trial justice's denial of their requested jury instruction about diagnostic tests, and not to any other portion of the charge. What they allege as error here has been waived by their failure to have objected below and is not properly before us.

 Even if the plaintiffs had objected at trial, the trial justice's instruction constituted an accurate recitation of Rhode Island law. When evaluating challenges to jury instructions, "we examine the instructions in their entirety to ascertain the manner in which a jury of ordinarily intelligent lay people would have understood them." *State v. Marini*, 638 A.2d 507, 517 (R.I.1994) (citing *State v. Gomes*, 604 A.2d 1249, 1256 (R.I.1992)). This Court "will not examine single sentences. Rather, the challenged portions must be examined in the context in which they were rendered." *Id.* (quoting *State v. Gordon*, 508 A.2d 1339, 1349 (R.I.1986)). Having examined the instructions in that light, we discern no error.

Finally, the plaintiffs contend that the jury instructions on the standard of care were faulty, causing the jury to return a verdict in favor of Women & Infants Hospital. That contention is irrelevant because the jury found no proximate cause between the hospital's negligence and Michael Anthony's injury. The plaintiffs did not directly appeal the jury's finding of no proximate cause, but in any case the jury's finding renders the plaintiffs' argument moot. In *Hodges v. Brannon*, 707 A.2d 1225, 1226, 1227 n. 7, 1228 n. 8 (R.I.1998), we held that the jury's finding of no proximate cause rendered moot the plaintiffs' contentions on appeal of erroneous jury instructions relating to the failure to warn and disclose. Thus, even assuming the plaintiffs to be correct, "the jury's finding of no proximate cause moots these contentions." *Id.* at 1227 n. 7.

### Conclusion

For the reasons above stated, the plaintiffs' appeal is denied and dismissed, and the judgments in favor of the defendants are affirmed. The papers of this case are remanded to the Superior Court.

Justice LEDERBERG and Justice FLANDERS did not participate.